**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**TERESA ANN ERICKSON,**

Plaintiff,

v.                                    **CIVIL ACTION NO.: 5:14-CV-74**
                                      **(STAMP)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

Defendant.

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

On May 29, 2014, Plaintiff Teresa Ann Erickson ("Plaintiff"), by counsel Jan Dils, Esq.,

filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn

W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant

to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No.

1). On August 4, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United

States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF

No. 7; Admin. R., ECF No. 8). On September 3, 2014, and October 2, 2014, Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J.

("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13). Plaintiff filed

her Response in Opposition on October 16, 2014. (Pl.'s Resp., ECF No. 15). Following review of

the motions by the parties and the Administrative Record, the undersigned Magistrate Judge now

issues this Report and Recommendation to the District Judge.

## II. PROCEDURAL HISTORY

On March 22, 2010, Plaintiff filed her first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on March 15, 2009. (R. 243-50). This claim was initially denied on June 2, 2010 (R. 124) and denied again upon reconsideration on July 29, 2010 (R. 129). On August 19, 2010, Plaintiff filed a written request for a hearing (R. 133), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on December 8, 2011 in Morgantown, West Virginia. (R. 33-67). Plaintiff, represented by counsel, Angela Bruncardi, Esq., appeared and testified, as did Eugene Czuczman, an impartial vocational expert. (Id.). The ALJ issued an unfavorable decision on January 5, 2012. (R. 100-11). Plaintiff requested review by the Appeals Council. On June 1, 2012, the Appeals Council remanded the case for another hearing before the ALJ. (R. 118-20). On December 12, 2012, the ALJ held the second administrative hearing in Morgantown. (R. 68-96). Plaintiff, represented by counsel, Justin White, Esq. appeared and testified, as did Mary Beth Kopar, an impartial vocational expert. (R. 69-70). On January 22, 2013, the ALJ again issued an unfavorable decision. (R. 7-23). On April 1, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-5).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on December 4, 1965, and was forty-four years old years old at the time she filed her SSI claim. (R. 243). She completed twelfth grade. (R. 79). Prior to moving to Minnesota, she stayed at home with her children as a homemaker for many years. (R. 302). She then worked as a waitress, baker/cook/server and in hotel food service/catering and retail sales. (R. 79, 81, 285, 295). Plaintiff testified she was single and had four children, ages twenty-seven, twenty-three, fifteen and twelve. (R. 74). Plaintiff previously lived in Albert Lea, Minnesota but moved to West Virginia in 2011. Plaintiff alleged disability due to mucosa-associated lymphoid

tissue ("MALT") lymphoma, irritable bowel syndrome, fibromyalgia, chronic fatigue syndrome, generalized anxiety disorder, major depressive disorder, anxiety, carpal tunnel syndrome, rheumatoid arthritis and bursitis in the hips. (R. 72, 283).

## B.    Medical History

### 1.  Medical Treatment Notes

Plaintiff's primary care physician, Dr. Steven J. Schulz, M.D. at the Albert Lea Medical Center, referred Plaintiff to the Mayo Clinic in Rochester, Minnesota for her longstanding history of irritable bowel syndrome ("IBS"). Plaintiff's treating physician at the Mayo Clinic was Dr. Grzegorz S. Nowakowski, M.D. (R. 352-69). On February 27, 2009, Dr. Nowakowski requested a hematopathology report involving blood tests, bone marrow aspirate and biopsies. (R. 353). On March 3, 2009, Dr. Nowakowski discussed the laboratory findings with Plaintiff, which showed MALT lymphoma limited to the terminal ileum (i.e., small intestines). (R. 368). At this time, Dr. Nowakowski noted that Plaintiff had "considerable diarrhea and change in her bowel habits and GI symptomatology," which "significantly interferes with her quality of life." (Id.).

On March 10, March 17, March 24 and March 31, 2009, Plaintiff initiated chemotherapy using Rituxan. (R. 356-58). Treatment notes from March 24 stated that Plaintiff overall felt well, she noticed "possibly some improvement in her diarrhea," she denied abdominal pain and was able to work full-time except for chemotherapy days. (R. 366). Her physical examination was normal and the impression stated that she "tolerates treatment with single agent Rituxan very well." (R 367). Her diagnosis was MALT lymphoma. (Id.). Her ECOG Performance Status was one, which means "[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work."[1]

---

[1]  See ECOG-Acrin Cancer Research Group, "ECOG Performance Status." (2015). http://ecog-acrin.org/resources/ecog-performance-status.

On May 8, 2009, Plaintiff presented to Albert Lea Medical Center for a follow-up appointment with Dr. Steven Schulz. (R. 404). Plaintiff sought treatment for depression as she had been dealing with her recent lymphoma diagnosis, experiencing stress and reported losing her job due to her medical conditions. (Id.). She reported problems with anxiety and sleeping. (Id.). The mental status exam showed Plaintiff to be alert and in no distress; she appeared to be somewhat nervous, occasionally seemed very depressed, her reasoning, judgment and insight were intact. (Id.). The physical examination noted her abdomen was soft, without tenderness and Plaintiff denied pain. (R. 404-05). Her diagnoses included depressive disorder – moderate/situational, lymphoma, anxiety disorder and insomnia. (R. 404).

On June 2, 2009, Plaintiff presented for her annual examination with Dr. Jodi Schulz, M.D. at Albert Lea Medical Center (R. 396-401). For her systems review, Plaintiff reported no unusual fatigue but did report that she had her "up and down days" during chemotherapy. (R. 396). Dr. Schulz noted a "long history of diarrhea which is now secondary to her lymphoma. She denies any changes in that, is controlled with Imodium." (Id.). She also denied changes in appetite, weight, dysphagia, abdominal pain, nausea, vomiting or constipation. (Id.). Plaintiff other systems were normal. (Id.). As for psychiatric symptoms, Plaintiff "feels her mood is well controlled with the Celexa at this time. She has no problems with anxiety or sleep." (Id.). Her other conditions included lymphoma of the small intestines, IBS and rheumatoid arthritis. (R. 397). The physical examination was normal. (R. 397-98).

On June 24, 2009, Plaintiff presented to an appointment at Albert Lea Medical Center with Dr. Cynthia Gilbert, PA-C, reporting back pain. (R. 390). Plaintiff stated that she had back pain in the left side of her buttocks for about a week; the pain did not radiate and she had no numbness, weakness or tingling in her lower extremities. (Id.). She could not think of anything in particular

that would have set off the back pain. (Id.). The physical examination showed pain on palpation in the sacroiliac joint area on the left side; she had fairly good range of motion; discomfort in the sacroiliac joint area with full flexion and with extension past thirty degrees; she could bend laterally to thirty degrees before any problems; discomfort was only noted when bending to the right and also in the left sacroiliac joint area; she could rotate about axis without difficulty; negative straight leg raise and 5/5 strength in the lower extremities. (Id.). Her diagnosis was lumbago, or back pain and Plaintiff was prescribed Naproxen to help with the pain. (Id.). Ms. Gilbert further noted that "this seems to be more of a muscle skeletal problem than anything that would appear to be underlying problem with her lymphoma." (R. 390-91).

On July 1, 2009, Plaintiff presented for a follow-up appointment at the Mayo Clinic. (R. 363). Dr. Nowakowski noted no major interval problems and Plaintiff denied adenopathy, night sweats or fevers. (Id.). He also noted that "she is fairly active" and her ECOG performance status was zero, meaning "Fully active, able to carry on all pre-disease performance without restriction."[2] Her medications included Celexa for depression, Estradiol for menopause symptoms, Imodium for loose stools, Lorazepam for anxiety, Naprosyn for an anti-inflammatory, Promethazine for nausea, Trazodone for sleep and Valtrex. (Id.). The physical examination was largely normal and the impression/plan noted that plaintiff tolerated treatment with Rituximab "very well." (R. 364). Plaintiff "continues to have diarrhea and other symptoms associated with her irritable bowel, it appears that the amount of Imodium used to control it has decreased. Therefore, she also has some symptomatic benefit. In addition, she was able to gain some weight since treatment." (Id.). Plaintiff also underwent a PET/CT scan for a restaging of her non-Hodgkins lymphoma. (R. 352). A comparison was made to the February 27 scan. (Id.). The imaging study showed "evidence of

---

[2] See supra note 1.

resolution of previously seen uptake on the PET scan," which "would be certainly suggestive of favorable response to therapy." (R. 364).

On August 29, 2009, Plaintiff presented to an appointment with Ms. Gilbert reporting a severe headache centered around and behind her right eye with sudden onset and sensitivity to light. (R. 387). The physical examination noted pain at a nine on a scale of ten; her head showed some increased tenderness in the periorbital area and the ethmoid sinus region; slight photosensitivity was also noted. (Id.). A head CT was done and showed fluid in her sinuses. (R. 388, R. 406). Diagnoses were sinusitis and headache. (R. 388).

On September 2, 2009, Plaintiff had an appointment with Dr. Jodi Schulz to follow-up on her hormone replacement therapy. (R. 383-85). Plaintiff did not address other medical issues but Dr. Schulz did note that Plaintiff has hot flashes, night sweats which keep her up at night and "a lot of stress going on in her life." (Id.).

On December 9, 2009, Plaintiff had a follow-up appointment with Dr. Steven Schulz for her lymphoma and diarrhea. (R. 378-82). As for her lymphoma ""this has been going fairly well" and "so far things are in remission." (R. 378). She "continues to have problems with diarrhea usual[ly] up to twelve times per day. Currently, she has been doing well with Lomotil usually just twice daily and would like to continue that." (Id.). As for smoking, she smokes about three-quarters of a pack per day and has tried to quit without success. (Id.). Plaintiff reported pain at an eight out of ten. (R. 380). Plaintiff's diagnoses included lymphoma, chronic diarrhea and tobacco use disorder with a past medical history of IBS, rheumatoid arthritis and depression. (Id.).

On January 8, 2010, Plaintiff had a follow-up appointment at the Mayo Clinic. (R. 360). Dr. Nowakowski noted that Plaintiff's July 2009 PET CT "showed evidence of excellent response with decrease in the uptake in the distal ilium. Although some uptake persisted, this was felt to be

mostly inflammatory and overall significantly reduced." (Id.). He further stated that "she continues to have irritable bowel symptoms with diarrhea. This is well controlled with addition of Lomotil. She denies any abdominal pain." (Id.). The systems review showed fatigue at a seven out of ten, pain at a four out of ten and overall quality of life at a seven out of ten (with ten being "as good as can be"). (R. 361). The physical examination was normal. (Id.). Plaintiff underwent another PET/CT scan, which was compared to scans from July 1, 2009 and February 27, 2009. (R. 352, R. 362). The impression noted that the decreased FDG uptake within the distal small bowel consistent with physiologic uptake. (R. 362). Dr. Nowakowski's impression/plan noted that Plaintiff "continues to do well and has no evidence of recurrent disease. Although she continues to have some of her irritable bowel symptoms, this appears to be stable." (Id.). Her diagnoses were MALT lymphoma and IBS, stable with current management. (Id.).

On March 12, 2010, Plaintiff presented to her primary care physician, Dr. Edward Shaman, M.D. at Albert Lea Medical Center for sinusitis. (R. 372-76). Her social history noted that Plaintiff "is now disabled working maybe four hours twice a week and finds that very bothersome causing her to be very short of breath and is having increasing dependency edema with that." (Id.). Plaintiff reported a "little bit of dependency edema in her lower limbs for which she uses" compression stockings. (R. 373). The physical examination was largely normal and noted no pedal edema at the time. (Id.). Also at this visit, Dr. Shaman provided Plaintiff with a work certificate which stated that Plaintiff was "unable to work until further notice." (R. 377).

On July 1, 2010, Plaintiff had an appointment with Dr. Jodi Schulz for her annual exam. (R. 502-08). Plaintiff had no specific concerns but reported significant fatigue, which she feels is out of proportion to where she should be. (R. 502). She denied cardivasular or respiratory problems. (Id.). Dr. Schulz noted Plaintiff's long history of diarrhea and noted that "there have

been no changes in her bowels" and she had some generalized abdominal cramps which were intermittent but not associated with anything specific. (Id.). As for psychiatric symptoms, Dr. Schulz noted that Plaintiff's mood was "very good at this time" notably because her children were visiting for the summer from California. (Id.). Her physical examination was largely normal. (R. 504). Relevant diagnoses included fatigue. (Id.).

On July 8, 2010, Plaintiff underwent an x-ray of her cervical spine due to complaints of pain. (R. 560). The impression showed degenerative arthritis, segmentation anomaly of the C3-C4 level, disc space narrowing of the C5-C6 and C6-C7 levels with spurs, slight kyophsis of the cervical alignment at the fusion level and post-fusion at the C4-C5 disc level. (Id.).

On July 28, 2010, Plaintiff had a follow-up appointment with Dr. Nowakowski for her MALT lymphoma. (R. 482). He noted that following her treatment with Rituxan "some uptake persisted, this was felt to be mostly inflammatory and overall significantly reduced." (Id.). Plaintiff reported that she continues to have "significant irritable bowel syndrome symptoms with mainly diarrhea and suboptimal control with Lomotil. In addition, she also complains of significant muscle discomfort and chronic fatigue and is currently undergoing evaluation for chronic fatigue syndrome/fibromyalgia by local MD." (Id.). For her systems review, she reported fatigue at a seven out of ten, pain at a seven out of ten and quality of life at a four. (R. 483). Her physical examination and laboratory results were unremarkable. (Id.). Her diagnoses included MALT lymphoma (with no evidence of recurrent disease); IBS, which Dr. Nowakowski noted appears to have worsened; fatigue/generalized muscle aches, for which Plaintiff was obtaining a fibromyalgia consultation. (R. 483-84). Dr. Nowakowski recommended repeating imaging studies due to the "persistent nature of her irritable bowel syndrome" because if she did have a recurrent lymphoma "this would

be hard to differentiate from her underlying IBS." (Id.). He also recommended referral to the GI Clinic and a consultation in the Fibromyalgia Clinic. (Id.).

On August 10, 2010, Plaintiff met with Dr. Glenn Leonard Alexander with the Gastroenterology and Hepatology Department at the Mayo Clinic. (R. 576). Dr. Alexander noted Plaintiff "carries a diagnosis of diarrhea-predominant irritable bowel syndrome for many years." (Id.). In spite of her treatment for MALT lymphoma, Plaintiff continued to report persistent diarrhea and stated that she has approximately twenty stools per day and about one stool at night approximately once or twice a week. (Id.). She will have multiple loose stools and then soon after eating she will have further stooling that continues throughout the remainder of the day. (Id.). She takes up to four Lomotil which makes her feel "washed out" but her bowel will be better controlled. (Id.). Plaintiff's physical examination was largely normal but Dr. Alexander noted she appeared somewhat anxious but answered questions appropriately. (R. 57). Her diagnoses included diarrhea-predominant IBS but Dr. Alexander noted "her symptoms are quite extreme for this." (Id.). He also diagnosed her with anxiety and noted that "I suspect this is playing a major role in her symptoms." (Id.). He recommended further testing and studies in order to exclude other pathologies regarding Plaintiff's IBS. (Id.).

Also on August 10, 2010, Plaintiff also met with Dr. Rozalina Grubina, M.D. in the Gastroenterology and Hepatology Department. (R. 478). Dr. Grubina noted Plaintiff's ten year history of daily diarrhea, attributed to IBS and terminal ileal MALT lymphoma. (Id.). Plaintiff reported daily diarrhea with zero to two stools overnight, six to ten stools between awakening and her morning meal, six to ten stools between that and lunch, an additional four to five stools between that and dinner, and two to three stools before bedtime. (Id.). She reported the diarrhea comes on suddenly with high urgency but is not painful. (Id.). Her stool frequency increases with stress and

anxiety, at which point she also experiences nausea (controlled by Phenergan), rare emesis and abdominal cramping. (Id.). Despite her successful treatment for MALT lymphoma "her diarrheal symptoms have not improved and have gradually gotten worse over the past ten years, significantly interfering with her quality of life." (Id.). She further noted that "she has not been able to work due to persistent diarrhea and frequent episodes of urge incontinence." (Id.). Plaintiff currently took Lomotil up to four times a day with improvement in diarrhea but limiting somnolence and she had failed therapy with Imodium. (Id.). Plaintiff denied persistent abdominal or back pain and other symptoms. (Id.). She did not drink alcohol and wished to stop smoking by Christmas. (Id.). The physical examination was normal but noted diffuse abdominal tenderness to deep palpation and also noted Plaintiff appeared anxious. (R. 480). Her diagnoses included chronic diarrhea; IBS; anxiety, depression; MALT lymphoma; fibromyalgia; and nicotine dependence. (R. 481). The impression/plan was to further rule out etiologies other than IBS for Plaintiff's IBS symptoms but Dr. Grubina did note that Plaintiff has features consistent with IBS including painless diarrhea, worse in the morning and exacerbated by anxiety. (R. 480). Plaintiff was to be seen in the Fibromyalgia Clinic later that day. (Id.). She declined a referral to Psychiatry but admitted her anxiety is a precipitant and exacerbating factor to her diarrhea. (Id.).

On August 10, 2010, Plaintiff presented for an appointment with Loretta M. Oliphant, RN in the Mayo Clinic for a Fibromyalgia and Chronic Fatigue Examination. (R. 474-77). The examination was also done in collaboration with Michelle Burke, CNP. (R. 572). Plaintiff presented with chronic pain, widespread musculoskeletal pain and fatigue occurring for six to seven years with a gradual progression of symptoms. (R. 474). Factors associated with the onset of symptoms included prolonged personal stress, surgery, physical and emotional abuse as an adult. (Id.). In describing her pain, Plaintiff reported pain on both sides of her body, above and

below the waist and in multiple muscle and joint groups; intermittent with variable intensity; described as an aching, burning, stiffness, numbness and tingling of extremities; aggravated by overexertion, physical activity, repetitive motion, stress, weather changes, poor sleep and prolonged sitting. (Id.). She rated her pain at a six out of ten. (Id.). She also reported experiencing a headache in the last month. (Id.). As for fatigue, the duration has been eighteen months; described as a persistent feeling of being tired or exhausted, not alleviated by rest and lasting more than fifty percent of the time. (Id.). She described the degree as moderate and rated her fatigue at an eight out of ten. (Id.). She reported post-exertional malaise lasting more than twenty-four hours in the past month, which interferes with her activities and occurs at least two days per week. (Id.). Her functional status is limited to housekeeping, working, shopping and social and leisure activities. (Id.). She reported difficulties sleeping. (R. 475). Her mood included stressors such as health status, finances, raising children, relationship with her boyfriend and health of her family. (Id.). She stated problems with her mood, including anxiety and depression, which have been longstanding since before pain and fatigue issues. (Id.). She noted her mood makes it difficult to do work, take care of things at home and get along with other people. (Id.). She also had difficulty with short-term memory, feelings of mental fogginess, especially after a restless night, and reported impaired memory or concentration in the last month. (Id.). She also reported symptoms of light-headedness, sense of imbalance, increased sweating, night sweats, IBS, cold and heat intolerance. (Id.). Plaintiff's current exercise routine includes gardening every day for about fifteen minutes. (Id.). Her past treatments included relaxation, stretching, TENS unit, psychological counseling and bextra therapy for arthritis. (Id.). The physical examination noted that fifteen of eighteen standard tender points were positive. (R. 477). As for the 1990 American College of Rheumatology criteria, she had widespread pain on both sides of the body (above and below the

waist), present for at least three months, with eleven out of eighteen tender points. (Id.). Plaintiff also met the 1996 Centers for Disease Control criteria. (Id.). Her nursing diagnoses included chronic pain and fatigue. (Id.).

Michelle M. Burke, CNP conducted the fibromyalgia consultation along with Ms. Oliphant. (R. 571-72). Ms. Burke noted she interviewed and examined the patient and reviewed and agreed with the history and exam as documented by Ms. Oliphant, RN. (R. 571). Ms. Burke noted Plaintiff's six-year history of chronic pain and widespread musculoskeletal pain and a more recent history of fatigue. (Id.). She also noted Plaintiff's MALT lymphoma diagnosis and her significant diarrhea-predominant IBS. (Id.). Plaintiff reported widespread pain above and below the waist in multiple muscle groups and joint groups. (Id.). She rated her pain at a six out of ten and reported pain in her hands and feet as well as having headaches. (Id.). She has post-exertional malaise twice a week. (Id.). She is limited in housekeeping work, shopping, social and leisure activities; she does gardening fifteen minutes a day. (Id.). She also reported difficulty with sleep and experiencing anxiety and depression. (Id.). Ms. Burke noted that Plaintiff "had severe anxiety and moderately-severe depression symptoms on screening." (Id.). However, she reported doing quite well from a mood standpoint. (R. 572). She has difficulty with memory and concentration. (Id.). The physical examination noted full range of motion of the shoulders, elbows, wrists, hips, knees and ankles; no specific joint swelling; normal strength; gait normal; toe and heel walking normal; and otherwise normal. (Id.). The exam did note Plaintiff was tender to palpation at fifteen of the eighteen standard points for fibromyalgia. (Id.). The impression/report/plan noted that Plaintiff's "presentation is consistent with a picture of fibromyalgia including widespread pain, widespread tender points and multiple associated symptoms." (Id.). She also has IBS and significant fatigue. (Id.). Her diagnoses were fibromyalgia and multifactorial fatigue. (Id.).

On August 23, 2010, Plaintiff presented for an appointment with Chris Anibal, CNP RN at Albert Lea Medical Center. (R. 510). Plaintiff specifically presented for anxiety. (Id.). She had been taking Celexa and Ativan, which she reported had been helpful but in the last several weeks she had been trying to get her boyfriend of four years out of the house due to his alcoholism. (Id.). She reported smoking about a pack a day, up from half a pack. (Id.). The physical exam was largely normal. (R. 510-11). The impression was anxiety, increased; depression, moderate and controlled with Celexa and nicotine dependence but planning to quit. (R. 511). The plan was to prescribe Xanax and continue other medication. (Id.). She noted her anxiety had exacerbated her IBS and that she had lost weight but was working hard to get her weight back up to normal. (Id.).

Plaintiff underwent laboratory testing for her IBS on September 16, 2010 (R. 517) and again on October 21, 2010 for her lymphoma (R. 522).

On October 21, 2010, Plaintiff had an appointment with Dr. Shaman. (R. 523). Plaintiff denied fever, muscle pain, joint pain or GI upset. (Id.). Her appetite had been good and weight stable. (Id.). The physical examination noted a small node on Plaintiff's neck but was otherwise normal. (Id.). The impression was lymphadenopathy and Dr. Shaman ordered a CT of her neck. (R. 523-24). The CT scan was normal and showed no abnormal masses. (R. 529, 559). The second problem Plaintiff reported as for chronic diarrhea. (R. 524). She reported that the Mayo Clinic in Rochester needed a sigmoidoscopy with biopsy of the sigmoid colon. (Id.).

On November 2, 2010, Plaintiff called Dr. Shaman and reported her fibromyalgia "is the worst it has ever been." (R. 532). She had tried Aleve, heat and rest but still rated her pain at a nine out of ten. (Id.). She reported spasms in her back and legs as well as pain in her knees and back, which she attributed to performing some light duties around the house. (Id.). Plaintiff was given a

prescription of Flexeril and Elavil for the spasms. (Id.). On November 5, 2010, Plaintiff called and reported that her spasms have stopped and her knee pain was much better. (R. 530).

On January 24, 2011, Plaintiff presented for a follow-up with Dr. Nowakowski. (R. 471). Plaintiff reported continued diarrhea related to her IBS. (Id.). Dr. Nowakowski noted "her symptoms controlled with Lomotil has not changed in recent months. She has worsening symptoms related to her fibromyalgia which she associated with decreased adherence to her fibromyalgia program and emotional distress related to splitting with her partner." (Id.). Her systems review listed fatigue at a nine out of ten, pain at an eight out of ten and overall quality of life at eight out of ten (with ten being as good as it can be). (R. 472). Her physical examination was largely normal. (Id.). Her PET scan showed mild increase uptake in the terminal ileum which was felt to represent physiological uptake. (Id.). The impression/plan noted the review of Plaintiff's laboratory and imaging studies with her regarding her MALT lymphoma; she still had no evidence of recurrent or progressive disease although she did have some mild increased uptake. (R. 473). He noted that "although she has underlying IBS with chronic abdominal complaints does appear to be stable." (Id.). As for her fibromyalgia, he noted that she was seen in the Clinic and had good result with the implementation of the exercises. (Id.).

On February 3, 2011, Plaintiff followed-up with Dr. Shaman for her IBS. (R. 533). Plaintiff reported that her IBS flared up again and she recently had a PET scan. (Id.). Plaintiff reported her appetite was good, weight stable but noted "more and more problems" with her fibromyalgia. (Id.). She stated that she tends to eat more comfort foods which may help with improving weight gain. (Id.). As for depression, she reported being relatively good with no continued problems of depression while on medication; she further noted improved self-esteem because she "kicked out her alcoholic boyfriend" and she stated "life is really good." (Id.). She also reported concern with

left flank discomfort occurring for about two months that seems more than her usual fibromyalgia and associated with some urinary frequency without dysuria. (Id.). The left flank pain feels like a muscle spasm and does not radiate. (Id.). It is there constantly and is sometimes aggravated by activity. (Id.). The physical examination was largely normal but noted tenderness overlying the left CVA, abdomen pot-bellied but without soft masses, guarding or tenderness. (R. 534). The impression/plan was IBS; recurrent small bowel lymphoma, follow up with gastroenterologic; left flank pain, primarily muscular, treat with medication; physical therapy, Plaintiff to try yoga; fibromyalgia, treatment unchanged; and depression, continue on medications. (Id.).

Also on February 3, 2011, Plaintiff had an x-ray of her lumbar spine due to her lower left side back pain. (R. 558). The impression noted L5 spondylosis with lumbar scoliosis. (Id.).

On February 9, 2011, Plaintiff presented for an appointment with Dr. Shaman with forms for her social security benefits. (R. 540). Dr. Shaman noted Plaintiff had long-standing problems with depression, fibromyalgia, IBS, recurrent intestinal lymphoma and a C-spine fusion. (Id.).

On February 26, 2011, Plaintiff present to Urgent Care Clinic at Albert Lea Medical Center with a sore throat and was diagnosed with acute pharyngitis. (R. 544).

On April 11, 2011, Plaintiff presented for a follow-up appointment with Dr. Shaman for her lower back discomfort. (R. 569). Plaintiff reported doing well for a period of time while on Tramadol but has had an exacerbation of her discomfort. (Id.). She described the pain primarily in the right SI that radiates down into the right buttock and as far as the mid-right thigh. (Id.). She stated that activity makes it worse, particularly with getting in and out of an automobile and going up and down stairs. (Id.). She denied tingling or strength but stated it feels somewhat weaker. (Id.). She rated the pain at a seven out of ten when sitting and a nine out of ten when walking. (Id.). She denied any GI or GU symptoms at this time. (Id.). The fourteen point review of systems was

negative except for the symptoms discussed above. (Id.). The physical examination was largely normal except for Plaintiff's SI problems. (R. 569-70). Dr. Shaman noted that while sitting upright there was marked tenderness over the right SI but diminished tenderness over the paraspinous muscles, no point tenderness in the buttock, straight leg raise normal and deep tendon reflexes normal. (R. 570). Plaintiff was able to heel and toe walk, extend, flex, agitate and side bend as well as do repetitive toe lifts with her left limb without discomfort. (Id.). The impression was right SI joint pain and Dr. Shaman recommended she continue with Tramadol and referred her to physical therapy for her right SI joint pain. (Id.).

On April 18, 2011, Plaintiff presented to HealthReach Physical Medicine and Rehabilitation Center for her right SI joint pain and lower back pain. (R. 491). She reported increased low back pain in January 2011 from an unknown injury or cause. (Id.). She described the pain as in her low back, left more than right, into the left buttock and forward into the groin region. (Id.). She stated the pain was constant and rated it at a six to a nine out of ten. (Id.). Plaintiff reported difficulty getting in and out of her chair at times, in and out of bed, bending (i.e., getting her socks and shoes on), walking, getting in and out of the bathtub or car and going up and down steps. (Id.). She stated that pain medications "take the edge off" and that heat seems to help. (Id.). She said she feels tired and if she overdoes it her pain is hot and has a sharp feeling, otherwise it is typically an achy feeling. (Id.). Her goal was to decrease her pain and improve mobility. (Id.).

The objective examination noted some abnormalities with her posture, active range of motion for her trunk, moderately limited extension and complaints of pain in her left hip, complaints of pain in her hip when side bending to the right, complaints of more pain with right side bending than left side bending, limited lower extremity flexibility on the left, limited lower extremity strength of hip flexors with 4/5 on the right and 3/5 on the left, seated straight leg raise

was asymptomatic on the left, supine straight leg raise resulted in increased pain in her hip at about fifty degrees of hip flexion, Fabere's test showed pain in posterior hip region, on palpation increased tenderness noted in the left buttock throughout and especially the piriformis, also tenderness in the low back quadratus lumborum area, lumbar paraspinals and mildly into the right lumbar paraspinals. (Id.).

Her initial treatment included isometric joint mobilization and she was instructed in exercises which included buttock and piriformis stretching. (R. 493). The assessment noted "good rehab potential," increased pain in the lower back as well as buttock and some difficulty in her daily activities as described above. (Id.). The plan was to continue physical therapy three times a week for six weeks focusing on strengthening and stretching exercises. (Id.).

On April 20, 2011, Plaintiff presented for physical therapy and reported that her left low back pain continued. (R. 495). She reported that she had increased pain the day before which she feels is due to the movements from the initial evaluation. (Id.). She stated her stretches were going well at home. (Id.). The objective assessment noted that Plaintiff's left iliac crest appeared to be higher on the left than the right and her left PSIS is higher than the right. (Id.). The treatment consisted of isometric joint mobilization. (Id.). They also reviewed her home stretches. (Id.). At this time, Plaintiff could do stabilization exercises without increasing her back or hip pain. (Id.).

On April 22, 2011, Plaintiff returned for physical therapy and reported increased pain which she rated a nine out of ten. (R. 494). She reported left low back and hip pain as well as left anterior thigh pain. (Id.). Plaintiff was treated with interferential electrical stimulation for twenty minutes (Id.). Plaintiff reported some diffuse pain following the treatment. (R. 495).

On May 9, 2011, Plaintiff followed-up with Dr. Shaman for her chronic low back pain. (R. 567). She reported doing much better with the therapy and chiropractic manipulation. (Id.). She

reported using Tramadol infrequently and that her fibromyalgia was much better as well. (Id.). She reported no radicular pain, no paresthesia and no change in strength or coordination. (Id.). She continued to have IBS with loose stools and is anxious. (Id.). She was nervous about traveling to see her son graduate, which would require driving there and back for four days out of seven. (Id.). Dr. Shaman recommended sitting properly in the car with her hips above her knees and take breaks every two to three hours. (Id.). The ten-point review of systems was negative and the physical examination was normal. (R. 568). The impression was chronic low back pain, improved; fibromyalgia, stable; irritable bowel, stable. (Id.).

On May 19, 2011, Plaintiff had a well-woman exam with Amy Newman NP at the Albert Lea Clinic. (R. 625). Her medical history "has been significant for fibromyalgia" as well as lymphoma. (Id.). Her social history noted that Plaintiff was smoking three to four cigarettes a day and was on the last step of her Quit Plan. (R. 626). She stated she tried to do yoga and stretching regularly but she finds any other activity to be difficult with her fibromyalgia and lymphoma. (Id.). She noted that she ate little fruits and vegetables as they cause significant abdominal cramping and diarrhea. (Id.). She further reported her dating relationship recently ended. (Id.). For her systems review, Plaintiff complained of fatigue and felt that "for the most part she [was] able to deal with her fatigue." (Id.). She suffered "with significant diarrhea" and stated that "it is even interfering with her activities" as she "does not leave the home very often, unless she has a well thought-out plan about where bathroom locations are." (Id.). She explained that "often times the diarrhea does come about very quickly." (Id.). She further complained of discomfort throughout her bones and joints because of her history of fibromyalgia. (R. 626-27). She denied any new pain or unusual low back pain. (R. 627). She reported some weakness, related to her lymphoma and fibromyalgia,

and reported her biggest area being "feeling tired or having little energy." (Id.). She denied any mental health symptoms. (Id.). The physical examination was largely normal. (Id.).

On May 20, 2011, Plaintiff presented for her last physical therapy visit, which was for her right SI joint pain and lower back pain. (R. 583). That day, she reported an increase in pain that day and rated her left low back at hip pain at a nine. (Id.). The discharge summary explained that Plaintiff had three sessions but cancelled April 25 due to illness. (Id.). She received muscle energy techniques, some stretching exercises, was able to progress to some stabilization exercises and received electrical stimulation at her last visit since she had an increase of pain. (Id.). Her goal of decreasing pain, getting out of bed, a chair or bathtub easier was not met. (Id.). However, she was being independent in her exercise program and noted that it did not produce pain. (Id.). The therapist was unsure if she met her long-term goals of being able to resume household tasks and increase her strength and walking ability, but did note that after her last visit with Dr. Shaman she reported feeling better and having no radicular pain.

On June 13, 2011, Plaintiff presented to Urgent Care reporting right elbow pain with no known injury. (R. 618). She stated the pain was worse with certain movements such as lifting of the hand carrying weight and certain movements make the pain worse even without carrying. (Id.). The physical examination showed no redness or swelling, no pain on palpation but minimal to moderate tenderness in the lateral epicondyle as well as the area distal to that. (Id.). She had pain with extension of the hand against resistance, and certain movements with pronation and supination to the extreme of supination aggravates it somewhat also, strength is 5/5 and neurovascular exam normal. (Id.). X-rays were completed and showed no abnormalities. (Id.).

On July 19, 2011, Plaintiff presented to an appointment with Dr. Shaman and reported anxiety related to child custody dispute with her ex-husband and her medical conditions. (R. 616).

She reported difficulty sleeping, problems with concentration, some anhedonia and noted that "she has certainly been angry, but has not had any negative thoughts." (Id.). Dr. Shaman noted that Plaintiff was tremulous and tearful but settled down after thirty-five minutes of counseling. (Id.).

On July 21, 2011, Plaintiff presented for her six-month follow-up appointment with Dr. Nowakowski at the Mayo Clinic. (R. 593). Plaintiff had no major interval problems lymphoma wise, she had been going through a lot of stress related mainly to family issues with child custody, she had frequent exacerbations of her IBS but overall had not seen a significant change in her bowel habits. (Id.). Her ECOF performance status was one. (Id.). The systems of review noted Plaintiff rated her fatigue at an eight out of ten, pain at a seven out of ten and her quality of life at a five out of ten. (R. 594). The physical examination noted Plaintiff appeared well, tired, but without acute distress and was otherwise normal. (R. 594-95). Plaintiff's laboratory results were unremarkable, the PET scan showed no evidence of residual or recurrent lymphoma. (R. 595). The impression/report/plan noted MALT lymphoma, no evidence of recurrent disease, as well as fibromyalgia/stress, being treated by Dr. Schulz locally. (Id.).

On August 9, 2011, Plaintiff had a follow-up appointment with Dr. Shaman in which he counseled her regarding her anxiety over her children being taken away from her. (R. 598). She discussed her decision to move back to West Virginia and to pursue legal options related to child custody. (Id.). Dr. Shaman noted Plaintiff was very lucid and oriented and not suicidal. (Id.).

On August 15, 2011, Dr. Shaman drafted a letter stated that Plaintiff had been his patient for the past year or so and "during this period of time, Ms. Erickson has developed a chronic serious medical problem for which she needs to be with family members." (R. 634). He further noted that "Being with family members would allow better support, better management of her

healthcare problems and a quicker recovery." (Id.). He then noted that he felt Plaintiff should move to West Virginia "as soon as possible." (Id.).

On September 9, 2011, Plaintiff presented to Dr. Ali Khan's office in West Virginia to establish care as a new patient and to discuss medication. (R. 637). Plaintiff's physical examination and review of symptoms was largely normal but Dr. Khan did note shortness of breath and dizziness. (Id.). His assessment included anxiety, stable and fibromyalgia. (Id.). Dr. Khan refilled Plaintiff's prescriptions and conducted various testing. (R. 637-41). On October 3, 2011, Plaintiff presented for a physical with Dr. Khan. (R. 635).

On November 4, 2011, Plaintiff presented to Dr. Khan reporting her hands going numb and night sweats. (R. 721). The assessment was fibromyalgia, fair, history of lymphoma and paresthesia of the hands. (Id.). Dr. Khan completed a nerve conduction and EMG report due to paresthesia of her hands. (R. 643). The sensory examination showed an increased peak latency and decrease amplitude in the right median nerve. (R. 645). The motor and sensory examinations were otherwise normal. (Id.). The conclusion was mild right carpal tunnel syndrome. (Id.).

On November 30, 2012, Plaintiff presented to Dr. Khan reporting a sore throat, coughing and headache. (R. 720). Dr. Khan adjusted Plaintiff's medications. (Id.).

On January 9, 2012, Dr. Khan ordered a PET CT scan for lymphoma restaging. (R. 697). The imaging showed no significant abnormalities and no evidence for lymphadenopathy. (Id.). There was a 3mm non-calcified nodule of the right middle lobe of uncertain etiology. (Id.). The PET images also demonstrated no significant areas of abnormal uptake of radionuclide but gastrointestinal uptake was seen, which otherwise appeared to be normal. (Id.). Overall, there was no evidence of active disease at this time. (R. 698).

On February 16, 2012, Plaintiff had a follow-up appointment with Dr. Khan. (R. 719). The assessment noted pain the knee with no history of trauma and Dr. Khan ordered an x-ray. (Id.). On February 24, 2012, Plaintiff called Dr. Khan's office "in tears stating she has had an emotional upheaval in her life." (R. 718).

On April 11, 2012, Plaintiff had an appointment with Dr. Khan and reported having a past cervical fusion that was grinding, shifting, painful and causing problems everywhere else. (R. 717). Plaintiff's assessment was neck pain and her medications were adjusted. (Id.).

On April 12, 2012, Plaintiff presented to Dynamic Physical Therapy with neck and upper back pain and reporting a cancer that affects the lining of the duodenum. (R. 669). The assessment noted findings consistent with cervical strain/sprain. (R. 670). Her limitations included cervical pain, limited cervical range of motion, decreased cervical strength, postural dysfunction, abnormal muscle tone/spasm and decreased functional status. (Id.). The goals were to return to her pre-injury level of function, report decreased pain at rest, demonstrate normal cervical range of motion and strength. (Id.). Her diagnosis was cervicalgia. (Id.). Physical therapy was recommended two times a week for six weeks. (Id.). After treatment on the 12th, Plaintiff reported less pain. (R. 671). At her next visit on April 16, Plaintiff reported that her neck "might be mildly better following the first visit." (R. 672). Plaintiff's treatment included moist heat and manual therapy. (Id.). Plaintiff responded well and showed improved range of motion following towel roll. (Id.). On April 19, Plaintiff stated her neck was feeling better with less pain but motion is about the same. (R. 673). On April 23, Plaintiff stated her neck had not been as good since starting isometrics. (R. 674). Treatment included moist heat and manual therapy and Plaintiff reported feeling better after therapy. (Id.). On April 27, Plaintiff reported doing well and reported mild discomfort at shoulders following treatment. (Id.). On April 30, Plaintiff reported being very sore all weekend with a

headache and inability to sleep. (R. 676). After treatment Plaintiff reported no headache and improved pain levels. (Id.). On May 4, Plaintiff reported that she felt better since the last treatment session; she then did well with treatment and reported no headache and improved pain levels. (R. 677). On May 8, Plaintiff stated she was "actually feeling pretty good, other than a few trigger points." (R. 678). After treatment, she reported that her trigger points did not resolved with therapy. (Id.). On May 10, Plaintiff reported receiving trigger point injections on Tuesday and was "so sore" that even her shirt laying on her shoulders hurt. (R. 679). After treatment, Plaintiff still had trigger points in her "right trap" that did not resolve. (Id.). On May 15, Plaintiff stated that she feels like she was "really improving;" she had a good response today with treatment with no headache or pain. (R. 680). On May 17, Plaintiff stated she was not having any pain; the assessment was that Plaintiff had met her goals. (R. 681). The discharge note to Dr. Khan stated Plaintiff had full cervical range of motion, mild tenderness in bilateral trap insertion on scap spine and 5/5 strength. (R. 682). Plaintiff intended to continue with home exercise program. (Id.).

On May 8, 2012, Plaintiff presented to an appointment with Dr. Khan reporting trigger points in her neck. (R. 716). Dr. Khan's diagnosis was fibromyalgia and he adjusted her medications. (Id.). On May 17, 2012, Plaintiff had a follow-up appointment with Dr. Khan and continued to report neck pain. (R. 715). On May 24, 2012, Plaintiff had a follow-up appointment with Dr. Khan to discuss her laboratory work. (R. 714).

On June 8, 2012, Plaintiff presented for an appointment with Dr. Khan reporting anxiety. (R. 712). The diagnosis was anxiety and Plaintiff was given a prescription to Vistaril. (Id.). On June 28, 2012, Plaintiff had a follow-up appointment with Dr. Khan and discussed her anxiety and medications. (R. 712). Plaintiff reported that she thinks her anxiety may be related to being an abused wife. (Id.). The assessment was anxiety. (Id.).

On July 17, 2012, Plaintiff presented to an appointment with Dr. Khan with papers to complete related to IBS, chronic fatigue and fibromyalgia. (R. 711).

On July 23, 2012, Plaintiff had an appointment with Dr. Homsi, another physician working with Dr. Khan, for an assessment of MALT lymphoma. (R. 710). The assessment noted MALT in Plaintiff's small intestine and that her January 2012 PET scan had been negative. (Id.).

On August 15, 2012, Plaintiff had an appointment with Dr. Khan and reported "pain all over." (R. 709). Her diagnosis was fibromyalgia and Dr. Khan prescribed additional medication. (Id.). On August 20, 2012, Plaintiff presented to Dr. Khan with pain in her left hip. (R. 708).

On August 22, 2012, Dr. Khan ordered a PET/CT scan as part of Plaintiff's lymphoma follow-up. (R. 688). The image was compared to a January 2012 study. (Id.). The impression noted no evidence of recurrent disease and no change in the 3mm non-calcified peripheral right middle lobe density from the prior study. (Id.). On August 27, 2012, Plaintiff presented for an appointment with Dr. Homsi. (R. 707). The assessment noted MALT lymphoma with no recurrence. (Id.).

## 2. Medical Reports & Opinion Evidence Regarding Plaintiff's Physical Conditions
### a. State Agency Medical Consultant, Physical RFC, May 22, 2010

Dr. Keith Moench, a State Agency medical consultant completed a Physical RFC Assessment on May 22, 2010. (R. 419-26). Plaintiff's primary diagnosis was listed as MALT lymphoma and IBS with a secondary diagnosis of rheumatoid arthritis and status post cervical fusion. (R. 419). Plaintiff was limited to occasionally lifting/carrying fifty pounds, frequently lifting/carrying twenty-five pounds, standing and/or walking about six hours, sitting for a total of six hours and pushing and/or pulling for an unlimited amount of time. (Id.). In support of these limitations, Dr. Moench noted that Plaintiff's lymphoma diagnosis has remained localized and she had been on Rituxan for treatment. (Id.). He stated that her IBS and diarrhea had been a significant issue but "it is relatively controlled with loperamide." (Id.). Her rheumatoid arthritis is listed in

her medical history, "but there are no exams documenting deformities or limited use of any extremity." (Id.). He noted that she had a cervical fusion per the past medical history in the MER. (Id.). He found that "there is no evidence in the MER to support carpal tunnel syndrome" but claimant reported wearing wrist splints at nights. (Id.). As for postural limitations, Dr. Moench found Plaintiff could frequently climb ramps and stairs and could frequently stoop, kneel, crouch or crawl. (R. 421). She could only occasionally climb ladders, ropes or scaffolds. (Id.). He found no manipulative, visual, communicative or environmental limitations. (Id.). Dr. Moench found Plaintiff's statements about her symptoms and their functional effects to be only partially credible. (R. 424). Dr. Moench explained that careful consideration had been given to the claimant's statements regarding her symptoms and functioning. (Id.). He found that the intensity of the symptoms and impact on functioning were not consistent with the totality of evidence, "specifically, there is no objective evidence to support all of her claims. In addition she has not been compliant with all of her treating physician's recommendations (quitting smoking) despite being diagnosed with lymphoma." (Id.).

**b. Disability Certification, Minnesota Health Care Programs, Dec. 17, 2010**

The record includes a Disability Certification from the Minnesota Department of Human Services' Minnesota Health Care Programs' State Medical Review Team (SMRT) dated December 17, 2010. (R. 467). SMRT reviewed Plaintiff's disability application and certified Plaintiff as disabled for Medical Assistance (MA) from June 1, 2010 through June 1, 2012. (Id.).

**c. Physical Residual Functional Capacity Assessment, Dr. Shaman, Feb. 9, 2011**

Dr. Shaman, Plaintiff's treating physician, completed a Physical RFC Assessment on February 9, 2011. (R. 460-62). He noted that Plaintiff had been a clinical patient for five years and she had been under his care for about one year. (R. 460). Her diagnoses included fibromyalgia, laminectomy with fusion, IBS, ileal lymphoma and depression. (Id.). Her symptoms included pain,

musculoligamentous and fatigue. (Id.). Her pain was characterized as peri-abdominal and joint pain. (Id.). As for clinical findings and objective signs, he noted increase bowel and trigger points appropriate. (Id.). Her treatment and medications included pain medication, anti-depressants and muscle relaxants. (Id.). Dr. Shaman noted Plaintiff's depression affected her physical condition. (Id.). Dr. Shaman found that Plaintiff's pain and other symptoms were severe enough to constantly interfere with her attention and concentration to perform simple work tasks. (Id.). He further found she was incapable of even "low stress" jobs. (R. 461). He explained his reasons included her enhanced depression, IBS and fibromyalgia. (Id.).

As for functional limitations, Dr. Shaman opined that Plaintiff could walk without rest or severe pain for about 200 feet, she could sit at one time for thirty minutes before needing to get up, she could stand for fifteen minutes at one time before needing to sit down or walk around and she could sit or stand/walk for less than two hours in an eight-hour work day. (Id.). He noted that she needed to include periods of walking for about ten minutes at a time every thirty minutes during her work day. (Id.). She also needed a job that permits shifting positions at will from sitting, standing or walking. (Id.). She also needed to take unscheduled breaks on a daily basis and would need to rest for fifteen to eighteen hours before returning to work. (Id.).

She could occasionally lift ten pounds or less, rarely lift twenty pounds and never lift fifty pounds. (Id.). She could rarely look down (i.e., sustained flexion of neck), occasionally turn head right or left and rarely look up. (R. 462). She could occasionally twist and stoop/bend, rarely crouch/squat, and never climb ladders or stairs. (Id.). She can grasp, turn and twist objects with her hands only five percent of the time, do fine manipulations only five percent of the time and can reach, including overhead, thirty-three percent of the time. (Id.). Plaintiff's conditions were

likely to produce "good days" and "bad days." (Id.). She was likely to be absent from work as a result of her impairments or treatment more than four days a month. (Id.).

### d. Letter from Dr. Shaman, December 5, 2011

Dr. Shaman addressed a letter to Plaintiff's attorney, Jan Dils, Esq. on December 5, 2011 regarding Plaintiff's diagnoses and condition. (R. 642). Dr. Shaman noted that he treated Plaintiff for roughly two years. (Id.). Her diagnoses included chronic depression, intestinal lymphoma and fibromyalgia. (Id.). Plaintiff "has difficulty with maintaining her weight, has chronic recurrent abdominal discomfort and has multiple joint pain associated with both her lymphoma and her fibromyalgia." (Id.). He also explained that Plaintiff "has had a depressive illness," which has worsened with child custody issues. (Id.). Dr. Shaman then opined that Plaintiff was "unable to be gainfully employed because of the chronic depression, because of her recent malignant disease, the lymphoma of her intestinal tract leading to malabsorption and difficult with weight gain and lastly with her fibromyalgia which causes severe joint pain." (Id.).

### e. WV DHHR General Physical, Dr. Khan, October 3, 2011

Dr. Khan completed a General Physical form for the West Virginia Department of Health and Human Resources on October 3, 2011. (R. 685-87). After examination, Dr. Khan noted largely normal findings except for psychiatric symptoms of anxiety and orthopedic symptoms involving pain in all joints. (R. 686). Her major diagnoses included fibromyalgia, MALT lymphoma and IBS and her minor diagnoses included anxiety and cervical fusion. (Id.). Plaintiff would be unable to work full-time and the duration of her inability to work full-time would last one year. (Id.). He did not find that Plaintiff should be referred for vocational rehabilitation. (Id.).

### f. Chronic Fatigue Syndrome RFC by Dr. Khan, July 27, 2012

On July 27, 2012, Dr. Khan completed a Chronic Fatigue Syndrome RFC Questionnaire. (R. 702-06). Dr. Khan reported seeing Plaintiff one to two times per month. (R. 702). Her

diagnoses included IBS, fibromyalgia and MALT lymphoma; her prognosis was poor. (Id.). Plaintiff had "unexplained persistent or relapsing chronic fatigue that is of new or definite onset, is not the result of ongoing exertion, and results in substantial reduction in previous levels of occupational, educational, social or personal activities." (Id.). He described Plaintiff's history of fatigue as being "due to medical conditions which have [led] to and added to the severity of this syndrome." (Id.). He noted that exclusions of other causes for Plaintiff's fatigue had been based on medical testing. (Id.).

Dr. Khan then identified the following symptoms that have persisted or recurred and did not predate the fatigue: self-reported impairment in short-term memory or concentration; sore throat; tender cervical or axillary lymph nodes; muscle pain; multiple joint pain without joint swelling or redness; headaches of a new type, pattern or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours. (R. 703). As for medical signs, Dr. Khan noted that Plaintiff had persistent reproducible muscle tenderness on repeated examinations, including the presence of positive tender points, over a period of at least six consecutive months. (Id.). Dr. Khan also noted the following mental findings: short-term memory deficit, visual-spatial difficulties, concentration limitations, depression, information processing limitations, comprehension problems and anxiety. (Id.). Plaintiff's treatment included B12 tablets and vitamin D. (R. 704). She was noted to not be a malingerer. (Id.). Emotional factors were noted to contribute to the severity of Plaintiff's symptoms and limitations. (Id.).

During a typical workday, Plaintiff's fatigue and other symptoms were severe enough to interfere constantly with her attention and concentration. (Id.). Plaintiff would be incapable of even "low stress" jobs. (Id.). She could walk zero blocks without rest. (Id.). She could sit for ten minutes at one time before needing to get up. (Id.). She could stand for five minutes at one time before

needing to sit down or walk around. (R. 704-05). She could sit or stand/walk for less than two hours total in an eight-hour work day. (R. 705). She would need a job which permits shifting positions at will from standing, standing or walking. (Id.). She would need to take eight or more unscheduled breaks during the work day during which she would rest for fifteen to twenty minutes before returning to work. (Id.). If engaging in occasional standing/walking, Plaintiff would need to use a cane or assistive device. (Id.). Plaintiff could occasionally lift less than ten pounds and could never lift ten, twenty or fifty pounds. (Id.). She could never twist, crouch or climb ladders and could rarely stoop (bend) and climb stairs. (Id.). She also has significant limitations in doing repetitive reaching, handling or fingering. (Id.). She could only use her hands to grasp, turn, or twist objects ten percent of the time with her right hand and fifteen percent of the time with her left hand. (R. 706). She could only do fine manipulations twenty-five percent of the time with her right and left hands. (Id.). She could never reach (including overhead) with either arm. (Id.). Her condition was estimated to produce both good and bad days. (Id.). She would likely be absent from work more than four days a month. (Id.).

### g.  Internal Medicine Examination by Dr. Stephen Nutter, August 17, 2012

Dr. Stephen Nutter, M.D. conducted an internal medicine examination on August 14, 2012. (R. 655-59). Plaintiff reported problems with frequent bowel movements on a daily basis as frequent as forty times a day on bad days and ten to fifteen times a day on good days. (R. 655). She reported a cramping pain in the mid-epigastric region as well as nausea and vomiting. (Id.). She reported fatigue, which can be quite severe, and overall lack of energy and feeling tired all the time. (Id.). She noted intermittent joint pain in her hands, wrists, elbows, shoulders, hips, knees, ankles and feet as well as generalized pain in her arms and legs. (Id.). She had joint back "for years and years." (R. 656). She had an increase in shoulder pain when using her arms overhead, as well as reaching, lifting, pushing and pulling. (Id.). She stated that walking, standing, kneeling,

squatting and going up and down stairs increases her knee pain. (Id.). Plaintiff stated she quit smoking in May 2011 but used to smoke half a pack a day. (R. 656).

The review of systems noted problems with edema, constant back pain in the lower back that radiates down both legs and constant neck pain that radiates down the right arm. (Id.). Her back pain is aggravated by bending, stooping, sitting, lifting, standing, coughing and riding in a car. (Id.). Her neck pain is aggravated by turning the head and rapid motions of the head or neck. (Id.). The physical examination noted normal gait, stable at station and comfortable in supine and sitting positions. (Id.). Plaintiff had pain and tenderness diffusely throughout the abdomen with no masses noted. (R. 659). She had pain and tenderness of the shoulders, knees, hips and hands, with crepitus of the left knee. (Id.). She had some tenderness of the left elbow and right wrist. (Id.). There was some reduced range of motion of the knees and shoulders and the entire right arm was tender. (Id.). She had Herberden's nodes noted. (Id.). Dr. Nutter concluded that these findings were consistent with osteoarthritis. (Id.). He also noted pain and tenderness and decrease range of motion of the cervical, dorsal and lumbar spine. (Id.). The straight leg raise test was negative, sensory testing intact and no definite evidence of nerve root compression. (Id.).

### h. Medical Source Statement of Ability to do Work-Related Activities (Physical) by Dr. Stephen Nutter, August 30, 2012

Dr. Nutter completed the Medical Source Statement regarding Plaintiff's physical abilities on August 30, 2012. (R. 660-65). He opined that Plaintiff could continuously lift or carry up to ten pounds, frequently lift or carry up to twenty pounds, occasionally lift or carry up to thirty pounds and never lift or carry thirty-one to 100 pounds. (R. 660). He attributed these limitations to lumbosacral pain, joint pain, abdominal pain and neck surgery. (Id.). He further noted that Plaintiff could sit for three, stand for two hours and walk for one hour at any one time without interruption. (R. 661). During the course of an eight hour work day, Plaintiff could sit for a total of four hours,

stand for a total of three hours and walk for a total of three hours. (Id.). As for use of her hands, Plaintiff could occasionally reach overhead, frequently reach in all other directions and could continuously do handling, fingering, feeling and pushing/pulling. (R. 662). She could continuously operate foot controls. (Id.). For postural activities, she could never crawl, occasionally climb stairs, ramps, ladders or scaffolds, occasionally stoop, kneel and crouch and could frequently balance. (R. 663). For environmental limitations, she could only occasionally be exposed to vibrations, frequently tolerate exposure to unprotected heights and could continuously be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and irritants as well as extreme cold and hot. (R. 664). In terms of activities, Dr. Nutter noted Plaintiff had no limitations in her ability to do activities like shopping, she could travel without a companion, she could ambulate without assistive devices, she could walk a block at a reasonable pace on rough or uneven surfaces, she could use standard public transportation, she could climb a few steps at a reasonable pace, she could prepare a simple meal, she could care for personal hygiene and she could sort, handle and use paper/files. (R. 665).

### 3. Medical Reports & Opinion Evidence Regarding Plaintiff's Mental Health

Plaintiff underwent numerous evaluations related to her mental impairments. The issues raised in Plaintiff's brief, however, do not contest the ALJ's findings regarding Plaintiff's mental conditions or the limitations associated with her conditions. Accordingly, while the undersigned carefully reviewed all medical evidence, a limited summary of the reports is provided:

- Mental Status Consultative Examination, Mark Kossman, Psy.D, LP, May 20, 2010 (R. 410-14): Plaintiff's diagnoses included: major depressive disorder – recurrent, moderate severity; dysthymic disorder, late onset; and generalized anxiety disorder.

- Psychiatric Review Technique, Dr. Nelsen, June 2, 2010 (R. 431-43): Dr. Nelsen found that Plaintiff did not meet the "B" or "C" Criteria for Affective Disorders (12.04) and Anxiety-Related Disorders (12.06).

- Mental RFC Assessment, Dr. Nelsen, June 2, 2010 (R. 445-48): Dr. Nelsen found only moderate limitations in Plaintiff's ability to perform work due to her mental impairments.

- Mental RFC Assessment, Dr. Shaman, Feb. 9, 2011 (R. 463-66): Dr. Shaman described the clinical findings regarding Plaintiff's impairments as despondent, anxiousness, poor concentration, insomnia, concrete thinking, anhedonia, and moderate depression. Her prognosis was fair to good.

- Psychological Evaluation by Martin Levin, M.A., July 20, 2012 (R. 647-50): diagnoses included major depressive disorder, single episode (because she has been continuously depressed since 2008) and moderate (based on the number and strength of symptoms). She was also diagnosed with post-traumatic stress disorder, which Mr. Levin attributed to the fact that Plaintiff "was abused as a child and has symptoms that include flashbacks, nightmares and panics in addition to the depression." The prognosis was "guarded."

- Medical Source Statement of Ability to Do Work-Related Activates (Mental) by Martin Levin, M.A., August 17, 2012 (R. 651-53): Plaintiff had moderate limitations in her ability to understand, remember and carryout complex instructions and moderate limitation in her ability to make judgments on complex work-like decisions. Plaintiff was moderately limited in her ability to appropriately interact with the public, with supervisors and with co-workers and moderately limited in her ability to respond appropriately to usual work situations and changes in routine.

## C.  Testimonial Evidence

At the ALJ hearing held on December 12, 2012, Plaintiff testified that she was single and living alone. (R. 74, 76). She has four children, ages twenty-seven, twenty-three, fifteen and twelve. (R. 74). She explained that the father has had sole custody of the two younger children for three years (R. 74-75). While she does not see the younger children often, she frequently talks with them over the phone. (R. 75). Her eldest son works in the food service industry and second eldest son is getting his engineering degree at West Virginia University. (R. 75-76).

Plaintiff testified in regard to her finances. She receives a personal loan of $800.00, which she uses to pay utilities and bills. (R. 79). She also receives Medicaid and food assistance in the amount of $200.00. (Id.). In 2011 and early 2012, Plaintiff received a cash grant from Community Action of Southeastern to help cover her finances. (R. 80-81).

Plaintiff testified she completed twelfth grade and has prior work experience as waitress (R. 79, 81). Plaintiff stated that she had not worked since her disability date of March 15, 2009. (R. 80). She then clarified that she attempted to work as a waitress at Blondie's Grill in January 2010 but "was not reliable in showing up." (R. 81).

Plaintiff further testified regarding her impairments and medications. Plaintiff stated that her IBS and psychological issues interfere most with her ability to work. (R. 82). Plaintiff explained that she gets very anxious around people, which then contributes to the IBS and requires her to take several trips to the restroom throughout the day. (Id.). Plaintiff further testified about how her other conditions and medications affect her ability to work:

> The arthritis, the fibro, and the carpal tunnel all make it very, very difficult for me to do things with my hands. The chronic fatigue is fed by the cancer and the IBS and the fibromyalgia, and my energy level is depleted rapidly. The medications that I take for all of these things leave me groggy and dizzy and dehydrated, and sometimes even double vision and blurred vision. The arthritis and the bursitis make it very difficult to sit or stand or be in any one position for any length of time.

(R. 82-83). Plaintiff stated that her cervical fusion limits her range of motion of her head. (R. 84). As for the impact of her carpal tunnel and fibromyalgia on her hands, Plaintiff testified that her hands are "quite frequently numb and swollen" and at times she struggles "to get my digits to come to my thumbs." (R. 88). She said that she often drops things, such as a coffee cup. (R. 89). She cannot use a computer "for any length of time" because her hands go numb and she has problems typing. (Id.). She estimated that she could sit at a computer and type for five minutes at best without some kind of problem. (Id.). As for her IBS, Plaintiff limits her symptoms by taking prescribed medication, but does "not get much result at all." (Id.). She explained that she must plan her functions or daily routine around when she will or will not eat in order to minimize trips to the bathroom. (Id.). For example, Plaintiff stated that she did not eat the day before or day of the hearing to "minimize how much I would have to deal with it in this short period right here while

we're seated." (Id.). She stated that even without eating, she would still have to go to the restroom fifteen to twenty times a day. (R. 89-90). When she is eating and drinking normally, she goes to the restroom thirty to fifty times a day. (R. 90). She explained that "it's quick, painful and repetitive." (Id.). As for her chronic fatigue syndrome, she needs to lie down for twenty minutes to an hour off and on all day but it depends on the fibromyalgia and the weather. (R. 90).

In regard to hospitalizations and medical history, Plaintiff testified that she had a mass removed as part of exploratory surgery at the Mayo Clinic. (R. 83). She last attended physical therapy in the spring of 2011, which she stated did not resolve her pain. (R. 83). The ALJ pointed out a physical therapy note from May 2012, in which Plaintiff stated she was not having any pain and noted that Plaintiff had reached her goals. (R. 84). The ALJ further referenced a note from April that showed a full range of motion and her strength at a five out of five. (Id.). When asked to clarify whether or not physical therapy resolved her pain, Plaintiff responded "[a]bsolutely not. It was only directed to one specific muscle in my neck. I have multiple pain throughout my body." (Id.). The ALJ then pointed to a May 15 note that states "It feels like really improving, good response, no pain, no headaches." (Id.). Plaintiff responded: "For that point in time, it was. I had received electrode therapy that eased up the muscle that was clamping down on my cervical fusion." (Id.). Plaintiff clarified that the physical therapy was just for the muscle spasms located around the area of her cervical fusion that were related to her fibromyalgia. (R. 87).

In regard to other treatment Plaintiff found helpful, Plaintiff testified that the trigger-point injections loosened some of her neck muscles but failed to improve range of motion. (R. 87). She explained that because of the cervical fusion, "there is only so far I can go unless I turn with my hips." (Id.). Plaintiff stated that she takes psychological medications, sees a psychologist and psychiatrist. (Id.). She finds the psychologist, who she sees monthly, to be far more beneficial

because "he is helping me learn some of the things that are wrong and ways to cope and what each medication…is targeted to help with." (Id.).

As for side effects from her medications, Plaintiff testified that she experiences grogginess and dizziness, she has lost her balance and fallen a couple of times in the last year and the medication is hard on her stomach and makes her sick. (R. 88). She said one medication for her stomach, makes her "completely sleepy" and also causes blurred vision. (Id.).

Plaintiff also testified regarding her daily activities. Plaintiff lives in a single-family home with one set of stairs (i.e., seven to eight steps) leading upstairs; Plaintiff typically uses the stairs twice a day. (R. 77). She sees her parents daily; they either come to visit or she drives approximately three blocks to their home. (R. 76-77). Her parents typically cook for her. (R. 76). She goes grocery shopping about one per month. (R. 80). When asked when she last cooked, Plaintiff explained she made a package of red beans and rice that required boiling water. (R. 86). Plaintiff is able to dress, shower and clean herself but she does use a shower chair and has a safety bar in the shower. (R. 84). Plaintiff uses a dishwasher but seldom does the dishes. (R. 85). She does about half a load of laundry a week but often her neighbor, Beth, helps her. (R. 85). She never vacuums or sweeps. (R. 85). She does not do any other housework. (R. 86). She cares for a companion cat, which involves feeding and changing the litter. (R. 86). As for driving, Plaintiff has her driver's license but rarely drives except for simple trips, like to visit her parents. (R. 78). Plaintiff's mother pays for her cell phone, which she uses to text with her children. (R. 85). She also receives assistance from her neighbor, Beth, who is she sees daily. (R. 85).

**D.    Vocational Evidence**

Also testifying at the hearing was Mary Beth Kopar a vocational expert. The ALJ stated that he found Plaintiff unable to perform her past relevant work. (R. 93). With regards to Plaintiff's ability to perform other work, Ms. Komar gave the following responses:

Q: Assume a hypothetical individual of the same age, education and work experience as the claimant, who retains the capacity to perform sedentary work with a sit-stand option, allowing the person to briefly, for one to two minutes, alternate sitting or standing positions at 30-minute intervals without going off-task, who is limited to occasional postural, except no climbing of ladders, ropes or scaffolds, and no crawling; whose overhead reaching is limited to occasional bilateral use; avoid concentrated exposure to extreme cold and heat; who must avoid concentrated exposure to wetness and humidity; who must avoid concentrated exposure to excessive vibration; who must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; whose work is limited to simple, routine, and repetitive tasks requiring only simple decisions with no fast-paced production requirements, and few workplace changes; who must have no interaction with the public and only occasional interaction with coworkers and supervisors; and the work site must be located without 100 feet of a restroom. Are there jobs in the regional or national economy that such an individual could perform?

A: Yes, Your Honor…ticket checker, unskilled, sedentary exertion…addressor, unskilled, sedentary exertion…laminator, unskilled, sedentary exertion…

(R. 93-94). The ALJ then asked about customary tolerances for unscheduled absences:

Q: Regarding tolerances, what are the customary tolerances that a typical employer would have as to an employee being late to work or having unexcused or unscheduled absences, and if that were exceeded, what would the result be?

A: For unskilled, entry-level work, typically a half a day to one day per month, and if it happened on a consistent basis would likely result in termination.

Q: What are the customary number and length of breaks that a typical employer permits during the work day?

A: Typically, two 15 minute breaks and a 30-minute lunch period.

Q: What are the customary tolerances for how much time during an eight-hour work day a typical employer would permit an employee to be off-task in addition to regularly scheduled breaks, and if that were exceeded, what would the result be?

A: Up to 15 percent off-task, and if exceeded on a continual basis, would likely result in termination.

(R. 94-95). Plaintiff's attorney then questioned Ms. Komar:

Q: If we added the following limitations [to the judge's first hypothetical] – according to 13F and also the new RFC, it said she could sit less than two hours a day and also stand or walk less than two hours a day. She could only occasionally stoop, and has fine manipulation at 25 percent of a work day, which, correct me if I'm wrong, I believe a third or the day is considered occasional, so I would [say] occasional fine manipulation bilaterally. If those were to be added, would those jobs still exist?

A: No.

Q: Would any jobs exist?

A: No.

(R. 95-96).

**E.  Report of Contact Forms or Disability Reports**

In an undated disability report, Plaintiff's medical conditions impacting her ability to work included: rheumatoid arthritis, cancer/mucosa-associated lymphoid tissue ("MALT"), IBS, depression and anxiety and carpel tunnel syndrome. (R. 283). The report further noted that Plaintiff's conditions cause fatigue, diarrhea, nausea, joint pain and stiffness, swollen hands, feet and ankles, depression and anxiety. (R. 290). She loses energy quickly and requires "a lot of rest" to recover. (Id.). Her swollen hands, feet and ankles make it difficult walk, stand and use her hands for any length of time. (Id.). Her joints swell and ache and she has weakness in her arms and hands. (Id.). She experiences arm, neck and back pain. (Id.). When she has an IBS flare-up the diarrhea becomes debilitating. (Id.). The type of cancer affects her immune system and has left her immune system compromised so she must avoid pathogens as much as possible. (Id.). As for work, she was currently working part-time as a waitress at a restaurant four hours a day, two days a week because the owner of the restaurant was a friend and made special accommodations so should could work just a few hours a week. (Id.).

When completing a work history report, Plaintiff explained that she worked as waitress four hours per day for two days a week from January to March 2010. (R. 296). She reported

walking for two hours, standing for two hours, handling small objects for thirty minutes and frequently lifting less than ten pounds (i.e., lifting small dinner plates, two at a time and carrying the plates six to eight feet to a table). (Id.).

In a June 28, 2010 Disability Report, Plaintiff reported a changed in her condition beginning in May 2010. (R. 313). She had been experiencing more stress, which triggers diarrhea and nausea. (Id.). She thus goes extended periods of time without eating to avoid the diarrhea and nausea. (Id.). She also has to plan ahead for any trips she may have, such as going to the grocery store, to make sure her stomach is empty so she does not have an accident or spend the whole time in the bathroom. (R. 316). She had been fatigued and tried a lot to the point that some days she does not get dressed. (R. 313). She stated her knees are swollen and hurt all of the time and she has to hold onto railings to walk down stairs. (R. 316). She further noted that she was depressed about her poor health, pain and discomfort. (Id.).

On August 18, 2010, another Disability Report was submitted, which noted Plaintiff was recently diagnosed with fibromyalgia and chronic fatigue. (R. 321). She stated she recently went to the Mayo Clinic in July 2010 for testing due to her IBS. (R. 324). Plaintiff also provided clarification on the most recent job she held as a waitress last spring. (R. 325). She explained that she was employed by a friend who made special accommodations for her to be able to work but that due to her frequent diarrhea and vomiting she could not continue to waitress even with accommodations. (Id.).

**F.     Lifestyle Evidence**

**1.     Adult Function Reports**

On an Adult Function Report dated March 26, 2010, Plaintiff described her daily activities as having coffee and resting after waking up. (R. 303). Then she tries to do "a couple simple household chores," such as dishes or a load of laundry. (Id.). During the day, she must stop

frequently (up to thirty times) to go the bathroom with diarrhea. (Id.). She must stop and rest several times a day. (Id.). If she does anything out of the house, she avoids eating until the end of the day to avoid using the bathroom in public. (Id.). She often ends up feeling weak, dehydrated and sleeps a lot. (Id.). She does not care for anyone else but does care for her "companion cat" by scooping litter box weekly. (R. 304). Her boyfriend helps with cleaning the litter box, feeding and providing water for the cat. (Id.). Due to her conditions, Plaintiff can no longer do anything on her feet for any length of time, cannot do much with her hands due to swelling and cannot do any strenuous activities. (Id.). Her conditions impact her sleep because she wakes up to go to the restroom with diarrhea, has sweats and chills and sometimes vomiting. (Id.).

As for personal care, she wears loose clothing to keep pressure off her abdomen, wears compression socks for swelling, she showers less and must sit to bathe due to weakness and pain and she no longer washes her hair daily because her arms get too tired. (R. 304). In regard to meals, she sometimes prepares her own meals, such as sandwiches, frozen meals and homemade small meals. (R. 305). She cooks about every other day for ten minutes to half an hour. (Id.).

In regard to house and yard work, she does dishes, small loads of laundry and light cleaning, such as dusting or sweeping. (R. 305). She usually cleans every other week for about thirty minutes or less. (Id.). Her boyfriend often helps with chores so she does not get too fatigued or tired. (Id.). She goes outside every few days if it is warm for fresh air. (R. 306). She is able to drive a car and can go out alone. (Id.). She goes shopping in stores for groceries, which typically takes thirty to forty-five minutes. (Id.). She is able to manage her finances and pay bills on time if she has enough money. (Id.). As for hobbies and interests, she watches television and reads occasionally. (R. 307). For social activities, she talks to her family on the phone and by email

almost daily. (Id.). She does not do much outside of the home socially, however, because she is usually fatigued and sick with vomiting or diarrhea. (Id.).

Plaintiff stated her conditions impact her ability to lift, stand, climb stairs and see. (R. 308). She is also limited in completing task and using her hands. (Id.). She explains that strenuous activity is limited because of the lack of strength in her limbs, swelling, body fatigue and pain. (Id.). Standing increases the speed of digestion, which causes more diarrhea. (Id.). She cannot handle small objects with her hands due to swelling and numbness. (Id.). She estimated she could walk for about fifty yard before needing to stop and rest. (Id.). She estimated she could pay attention for about an hour, has difficult finishing what she starts, follows written and spoken instructions well and gets along very well with authority figures. (R. 308-09). She reported not handling stress very well and that she gets upset about her digestive system. (R. 309). She does not handle changes in routine very well. (Id.). She uses wrist braces. (Id.).

As for additional remarks, Plaintiff noted that she works light duty eight hours per week. (R. 310). When she know she has to work, she gets extra rest and avoids eating the day prior. (Id.). She does very little other than rest for the next day or two after attempting to work. (Id.).

### 2. Third Party Evidence

Plaintiff's close friend of twenty years, Dennis Rogalsky, PE, Ph.D, submitted a letter offering his perspective of Plaintiff's physical decline dated July 21, 2011. (R. 338). He first discussed Plaintiff's physical condition in the early 1990s, which he described as full of "energy and drive." (Id.). He described her ability to lift furniture and assist with moving her home. (Id.). Then he described his recent visit with Plaintiff in May of 2011, which involved traveling from Albert Lea to West Virginia. (Id.). Dr. Rogalsky stated "I was completely unprepared for the physical toll the multiple diseases and treatments have taken on Traci." (Id.). He described her gaunt and weak physical appearance. (Id.). He further noted limitations he observed:

During our week together, it was clear that what Traci described as "good days" on the phone were a state of mind, since every day was a physical challenge. Traci's days are a balancing act; breaking everyday activities up into small steps that allow period for rest and recovery in-between. Knowing that if she pushes too far at once, the balance is tipped and the pain will force the need to lay down for an extended recovery of hours or days.

(Id.). He described Plaintiff's difficulty while on their road trip: Plaintiff looking visibly strained after sitting in the car for a few hours and needed to stop and get out of the fixed position. (Id.). After traveling a day, even with stops, Plaintiff was "worn out" and at time needed assistance to get out of the car. (Id.). Dr. Rogalsky concluded: "the hardest realization for me on the trip was that I was observing Traci on her 'good days.' From these experiences, I now understood the full impact of her 'bad days' when the pain and fatigue essentially confine her to bed." (Id.).

Daniel Gibbons, Plaintiff's former employer at Blondie's Grill also submitted a letter on October 25, 2012. (R. 342). He stated that Plaintiff worked at the Grill from January 2010 through March 2010. (Id.). He stated that "her departure was due to health related limitations" and that "her health absences also contributed greatly to the departure of Ms. Erickson." (Id.).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled

at one of the five steps, the process does not proceed to the next step. Id.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process, the ALJ made the following findings:

1. The claimant has not engaged in "substantial gainful activity" at any time during the period at issue herein, i.e., since the March 10, 2010, filing date of her most recent application for SSI (20 CFR § 416.920(b)).

2. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: residual effects, status post remote (2005) cervical spine fusion surgery at C2-4; generalized osteoarthritis/question of fibromyalgia and chronic fatigue; "mild" right carpal tunnel syndrome; irritable bowel syndrome; mucosa-associated lymphoid tissue (MALT); question of rheumatoid arthritis; major depressive/dysthymic disorder(s); and generalized anxiety/posttraumatic stress disorder(s) (20 CFR § 416.920(c)).

3. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 416.920(d), 416.925 and 416.926).

4. Throughout the period at issue, the claimant has had the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; affords a sit/stand option such as would allow at least brief 1 to 2 minute changes of position within intervals of 30 minutes, without breaking task; requires no crawling, no climbing of ladders, ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., balancing, climbing ramps/stairs, crouching, kneeling and stooping); requires no more than occasional overhead reaching; entails no concentrated exposure to temperature extremes, wetness, humidity, excessive vibration and no exposure to hazardous machinery, unprotected heights or commercial driving; is limited to simple, routine and repetitive tasks that require simple decisions, entail no fast-paced production and present few workplace changes; requires no interaction with the general public and no more than occasional interaction with coworkers/supervisors; and affords restroom access within 100 feet (20 CFR §§ 416.920(e) and 416.967(a)).

5. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR § 416.965).

6. The claimant during the period at issue is considered for decisional purposes initially as a "younger individual age 18-44" and, upon and after her attainment of age 45 in December 2010, a "younger individual age 45-49" (20 CFR § 416.963).

7. The claimant has attained a "high school" education and is able to communicate in English (20 CFR § 416.964).

8. The claimant has acquired no work skills that are transferable to any job that has remained within her residual functional capacity to perform during the period at issue (Social Security Ruling 82-41, and 20 CFR § 416.968 and Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 416.960(c) and 416.966).

10. The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since March 10, 2010 (20 CFR § 416.920(g)).

(R. 13-23).

# VI. DISCUSSION

## A.  Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contention of the Parties

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence when the record as a whole is reviewed by the Court." (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges that:

- Whether the ALJ failed to appropriately consider and weigh the opinions of Erickson's treating physicians.

- Whether the ALJ failed to comply with the Appeals Council's Remand Order of June 1, 2012.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 12, ECF No. 12). Plaintiff asks the Court to "remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence and proper legal standards." (Id. at ).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- The ALJ followed the Appeals Council's Order and the Commissioner's Regulations.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 9-14, ECF No. 14).

## C.    Analysis of the Administrative Law Judge's Decision

On June 1, 2012, the Appeals Council vacated the ALJ's first hearing decision and remanded the case to the ALJ. (R. 118). The Appeals Council noted that the decision failed to contain an "adequate evaluation" of the treating source opinion from Edward R. Shaman, M.D., which indicated greater functional limitations than those reflected in the RFC. (Id.). (R. 118-19). The Appeals Council also found that "further evaluation of the claimant's severe impairments is warranted," particularly Plaintiff's fibromyalgia and carpel tunnel syndrome. (R. 119). The Council found that "the record contains medical evidence from the Mayo Clinic establishing a diagnosis of Fibromyalgia based in part on identification of 15 of 18 tender points." (Id.). The Appeals Council also noted that "new evidence from Dr. Khan dated November 4, 2011, received after the request for review, indicates a diagnosis of Mild Right Carpal Tunnel Syndrome." (Id.). The Appeals Council further directed the ALJ to update the record concerning Plaintiff's fibromyalgia, carpal tunnel syndrome and IBS, including obtaining a consultative examination or medical source statement. (Id.). The ALJ was also directed to further evaluate Plaintiff's subjective

complaints and to obtain supplemental evidence from a VE to clarify the effect of assessed limitations on Plaintiff's occupational base. (Id.).

The Social Security regulations provide that the "administrative law judge shall take any action that is ordered by the Appeals Council." 20 C.F.R. § 404.977(b). There is disagreement among federal courts as to whether the failure to follow an Appeals Council's remand order serves as an independent ground for reversal absent other error. See Kearney v. Colvin, 14 F. Supp. 3d 943, 950 (S.D. Ohio 2014) (discussing disagreement among district courts). Some courts have held that "Section 405(g) does not provide the district courts with jurisdiction to act on an ALJ's noncompliance with the Appeals Council's remand order because such an order is merely an intermediate agency action and not the final decision of the Commissioner." Huddleston v. Astrue, 826 F. Supp. 2d 942, 954 (S.D.W. Va. 2011); see e.g., Yonek v. Astrue, No. CIV.A. TMD 09-2905, 2011 WL 1231154, at *2 (D. Md. Mar. 28, 2011) ("the failure of an ALJ to follow the precise dictates the Appeals Council's remand order does not automatically warrant a remand."); Brown v. Commissioner of Social Security, 2009 WL 465708 at *5 (W.D. Mich. Feb. 24, 2009) ("Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision"); Bass v. Astrue, No. 1:06–cv–591, 2008 WL 3413299 at *4 (M.D.N.C. Aug. 8, 2008) ("[t]he Court does not review internal agency-level proceedings, and therefore will not address whether the ALJ complied with specific provisions of the Appeals Council's remand order"). As such, the critical inquiry remains whether the Commissioner's final decision denying benefits is support by substantial evidence and applied the correct legal standards. See e.g., Miller v. Barnhart, 175 Fed. Appx. 952, 956 (10th Cir. 2006) (holding that because "the Appeals Council found that the third ALJ complied with its remand order ... [i]t is appropriate to examine the Commissioner's final decision under our usual standards,

rather than focusing on conformance with particular terms of the remand order"); Yonek v. Astrue, No. CIV.A. TMD 09-2905, 2011 WL 1231154, at *2 (D. Md. Mar. 28, 2011) (holding that "regardless of whether the ALJ fully complied with the Appeals Council's remand order, judicial review is limited to the question of whether the ALJ's decision is supported by substantial evidence and reflects application of the correct legal standards"); Figaro v. Astrue, No. CV 08–01615, 2010 WL 273168, at * 3 (C.D. Cal. Jan.14, 2010).

However, some courts have held that the ALJ's failure to follow the directives of the Appeals Council requires remand. See e.g., Salvati v. Astrue, 2010 WL 546490 at *7 (E.D. Tenn. Feb. 10, 2010) ("To recognize substantial evidence as a defense to non-compliance...would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory," citing Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 546 (6th Cir. 2004)); Mortise v. Astrue, 713 F. Supp. 2d 111, 123 (N.D.N.Y. 2010) (remanding the case for a calculation of benefits because "[i]t is error for an ALJ to not follow the Appeals Council's orders."); Scott v. Barnhart, 592 F. Supp. 2d 360, 371 (W.D.N.Y. 2009) (holding that "[t]he ALJ's failure to comply with the Appeals Council's order constitutes legal error, and necessitates a remand."). A district court within this Circuit considered the failure of the ALJ to follow a remand order in terms of the harmless error analysis:

> the undersigned finds that an ALJ's failure to follow the directives of remand order issued by the Appeals Council constitutes legal error, but declines to accept Claimant's position that this error automatically requires reversal and remand. Instead, the Court finds that the failure of an ALJ to follow the directives of the Appeals Council necessitates remand only when that error results in harm to the claimant.

Huddleston, 826 F. Supp. 2d at 955; Quimby v. Comm'r of Soc. Sec., 2010 WL 2425904 (D. Vt. Apr. 13, 2010) ("An ALJ commits reversible error by ignoring an Appeals Council's mandate only when the error is harmful, "i.e. only to the extent that substantial evidence does not support the

ALJ's ultimate conclusions."). The undersigned has adopted the approach taken by the Southern District of West Virginia. See Huddleston, 826 F. Supp. 2d at 955. Accordingly, the Court first reviewed the ALJ's decision to determine whether the ALJ followed the Appeals Council's remand order. In finding error occurred, the undersigned then considered whether such error resulted in harm to Plaintiff. When determining whether such error was harmless, the undersigned assessed whether the ALJ's decision was supported by substantial evidence and involved no legal error.

### 1. Whether the ALJ Failed to Comply with the Appeals Council's Remand Order

The undersigned finds that the ALJ failed to follow the Appeals Council's remand order. The ALJ failed to follow the directives to give further consideration to Plaintiff's diagnosis of fibromyalgia, specifically, whether the condition was severe; to update the record concerning Plaintiff's fibromyalgia; and to further consider Plaintiff's RFC in support of assessed limitations by evaluating Plaintiff's treating source opinions. (R. 119).

While the ALJ's decision at least discusses fibromyalgia (his first decision failed to mention fibromyalgia at all), the ALJ still disregarded the specific directives of the Appeals Council regarding this condition. The Appeals Council directed the ALJ to give specific consideration as to whether Plaintiff's fibromyalgia was a severe impairment. (R. 119). The ALJ found "question of fibromyalgia" as a severe impairment. (R. 13). In his explanation, the ALJ noted that Dr. Shaman and Dr. Khan did not follow the appropriate diagnostic criterion and Dr. Nutter's consultative examination only yielded findings of osteoarthritis. (R. 13-14). The ALJ further noted that Plaintiff's reported pain had been "relatively vague, and in any case, not 'disabling'; on September 9, 2011, Plaintiff reported "doing fair" with fibromyalgia; and that "all of claimant's joints were painful." (R. 14). Despite this discussion, the ALJ left the ultimate question unanswered as to whether he considered fibromyalgia to be a medically determinable

impairment and whether such an impairment was severe or not. Instead, the ALJ made vague findings regarding the condition and provided little explanation. Moreover, the ALJ again ignored medical evidence from the Mayo Clinic diagnosing Plaintiff with fibromyalgia despite the Appeals Council's specific recognition of the evaluation "establishing a diagnosis fibromyalgia." (R. 119). Accordingly, the ALJ's decision failed to properly consider Plaintiff's fibromyalgia diagnosis.

Second, the ALJ failed to update the record regarding what Plaintiff could still do despite her impairments, specifically fibromyalgia, IBS and carpal tunnel syndrome. While the ALJ sought a consultative examination, the CE failed to consider Plaintiff's fibromyalgia, IBS or carpal tunnel syndrome. (R. 655-59). Instead of addressing the conditions at issue, the CE provided an entirely new diagnosis not previously assessed by any of Plaintiff's treating physicians. (Id.). The undersigned notes that the ALJ has discretion in deciding whether to order a consultative examination.[3] In this case, however, the ALJ decided to order the CE, but then failed to follow the Appeals Council's directive to update the record concerning Plaintiff's conditions. (R. 119).

Third, the Appeals Council directed the ALJ to give further consideration to Plaintiff's RFC and properly evaluate the treating source opinions, specifically Dr. Shaman's opinion. (R. 119). In his first decision, the ALJ assigned "little weight" to Dr. Shaman's opinion. (R. 118). On remand, the ALJ declined "to accord [Dr. Shaman's opinion] any significant weight." (R. 19-20). As discussed in detail below, the undersigned finds that the ALJ again failed to provide adequate reasons in assigning no significant weight to Dr. Shaman's opinion. Moreover, the ALJ failed to

---

[3] SSR 12-2p provides: "We may purchase a consultative examination (CE) at our expense to determine if a person has an MDI of FM or is disabled when we need this information to adjudicate the case. (a) We will not purchase a CE solely to determine if a person has FM in addition to another MDI that could account for his or her symptoms. (b) We may purchase a CE to help us assess the severity and functional effects of medically determined FM or any other impairment(s). If necessary, we may purchase a CE to help us determine whether the impairment(s) meets the duration requirement." SSR 12-2p, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012).

properly assign any weight to Dr. Khan's opinion. (R. 20). Accordingly, the undersigned finds that the ALJ failed to follow the Appeals Council's directive to properly evaluate Plaintiff's treating source opinions pursuant to 20 C.F.R. § 416.927 and SSRs 96-2p and 96-5p.

The Court finds that the ALJ committed legal error by failing to follow the Appeals Council's remand order in the three areas mentioned above. Accordingly, the Court next looks to whether the ALJ's failure to follow the Appeals Council's remand order resulted in harm to Plaintiff; specifically, whether the ALJ's decision is still supported by substantial evidence. See Huddleston, 826 F. Supp. 2d at 955.

### 2. Whether the ALJ's Decision is Supported by Substantial Evidence
#### a. Whether the ALJ's Properly Considered Plaintiff's Fibromyalgia

Plaintiff argues that on remand the ALJ again failed to adequately evaluate Plaintiff's fibromyalgia. (Pl.'s Br. at 14). Defendant argues that the ALJ "seriously considered fibromyalgia" and then updated the record by obtaining evidence from treating providers and ordering consultative examinations. (Def.'s Br. at 12-13).

In his decision, the ALJ found as a severe impairment: "generalized osteoarthritis/question of fibromyalgia." (R. 13). He found Plaintiff's fibromyalgia diagnosis to be "not particularly well-supported" and that it had been "indicated only intermittently or otherwise in limited instances by treating physicians" Drs. Shaman and Khan. (R. 13-14). Moreover, the ALJ found that "there is no clear indication that Drs. Shaman or Khan arrived at such diagnosis after having identified positive findings at 11 or more of 18 recognized 'tender points.'" (R. 14). Therefore, the ALJ concluded that the diagnosis appeared "to have been rendered with somewhat questionable or insufficient methodology." (R. 15). When discussing Plaintiff's RFC, the ALJ again emphasized that Plaintiff "purported" diagnosis of fibromyalgia by her treating physicians was "questionable at best in terms of validity." (R. 20).

In rejecting Plaintiff's fibromyalgia diagnosis, the ALJ failed to address key medical evidence that contradicted his own findings. For example, the ALJ ignored medical evidence from the Mayo Clinic diagnosing Plaintiff with fibromyalgia on August 10, 2010. (R. 474-77; 571-71). These records specifically found that Plaintiff met the 1990 American College of Rheumatology criteria and the 1996 Centers for Disease Control criteria for fibromyalgia. (Id.). The undersigned is left wondering why these records were ignored and what consideration, if any, the ALJ gave to the records. As the Fourth Circuit explained:

> The courts…face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977). The August 10, 2010 fibromyalgia evaluation from the Mayo Clinic is a relevant and probative record that was specifically credited by the Appeals Council. By ignoring this record, the undersigned is unsure whether the ALJ analyzed all the evidence and whether the ALJ considered the diagnoses and limitations contained within this Mayo Clinic record.

Defendant argues that the ALJ properly discredited Plaintiff's fibromyalgia diagnosis at the Mayo Clinic because the fibromyalgia evaluation was conducted by a nurse practitioner, which is not an acceptable medical source pursuant to SSR 12-2p.[4] (Def.'s Br. at 12). The undersigned finds Defendant's argument unavailing. First, the ALJ never provided this explanation in his decision. As such, Defendant's post-hoc rationalization for the ALJ's action is not permissible.

---

[4] SSR 12-2p states: "a person can establish that he or she has an [medically determinable impairment] of [fibromyalgia] by providing evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence." SSR 12-2p, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012).

See <u>Radford v. Colvin</u>, 734 F.3d 288, 294 (4th Cir. 2013) (citing <u>Christopher v. SmithKline</u> <u>Beecham Corp.</u>, 132 S. Ct. 2156, 2166 (2012)); <u>see also</u> <u>Robertson-Furry v. Astrue</u>, No. 3:10-CV-110, 2011 WL 4628685, at *4 (N.D.W. Va. Oct. 3, 2011) (stating that "this Court will not affirm an ALJ based upon its own post hoc rationalizations."). Second, even though Plaintiff's fibromyalgia evaluation at the Mayo Clinic was performed by a nurse practitioner, this does not excuse the ALJ from considering such relevant evidence. SSR 12-2p states that "information from non-medical sources can also help us evaluate the severity and functional effects of a person's FM." SSR 12-2p, 2012 WL 3104869, at *4. Moreover, SSR 06-03p "provides specific guidance for the level of explanation required for evaluations of 'other source' evidence:

> Since *there is a requirement to consider all relevant evidence in an individual's case record*, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity…the adjudicator generally should explain the weight given to opinions from these 'other sources,' or *otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning*, when such opinions may have an effect on the outcome of the case."

SSR 06-03p, 2006 WL 2329939, at *6 (August 9, 2006) (emphasis added). While the Rules distinguish between acceptable medical sources and non-medical sources, they do not provide for the dismissal of medical evidence solely because it was completed by a nurse practitioner, not a physician. To the contrary, the Rules direct the ALJ to consider and discuss all relevant evidence. The fibromyalgia evaluation completed by the certified nurse practitioner in the Fibromyalgia Clinic at the Mayo Clinic is relevant evidence, particularly in light of the Appeals Council's remand order recognizing Plaintiff's diagnosis of fibromyalgia from these Mayo Clinic records. By failing to discuss the evaluation at all, the undersigned is unable to follow the ALJ's reasoning in rejecting Plaintiff's fibromyalgia diagnosis in spite of this evaluation and Plaintiff's subsequent fibromyalgia diagnosis by three treating source physicians: Dr. Nowakowski, Dr. Shaman and Dr.

Khan. Accordingly, the undersigned cannot determine whether the ALJ's decision is supported by substantial evidence.

### b. Whether the ALJ Properly Assessed Plaintiff's RFC

Because it is unclear whether the ALJ found Plaintiff's fibromyalgia to be a medically determinable impairment, it is also unclear whether the ALJ considered the limitations associated with the condition when formulating his RFC. The Commissioner is required to assess a claimant's RFC based on "all the relevant evidence" in the case record." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 21996). While the ALJ stated he considered Plaintiff's allegations of "fatigue and joint/arthritic pain" (R. 15), these symptoms do not account for the widespread musculoskeletal pain and other symptoms associated with fibromyalgia. (R. 474-75). Because of the ALJ's vague findings regarding Plaintiff's fibromyalgia diagnosis and the ALJ's rejection of all treating source opinions regarding limitations associated with this condition, the undersigned is unable to determine whether the ALJ considered Plaintiff's fibromyalgia to be a medically determinable impairment and whether associated limitations with the condition were considered when formulating the RFC. Accordingly, the undersigned cannot determine whether the ALJ's decision is supported by substantial evidence.

In addition, the ALJ also failed to explain what limitations, if any, he associated with Plaintiff's carpal tunnel syndrome, which he found to be a severe impairment. (R. 13, R. 16-21). Plaintiff argues that the ALJ failed to include any limitations in the RFC to accommodate Plaintiff's condition. (Pl.'s Br. at 17). Defendant argues that the ALJ found "mild" right carpal tunnel syndrome to be a severe impairment and appropriately limited Plaintiff to sedentary work,

53

which involves minimal lifting and carrying. (Def.'s Br. at 14). In finding Plaintiff's "mild" right carpal tunnel syndrome to be a severe impairment, the ALJ referenced Plaintiff's electromyography (EMG) and sensory nerve conduction study (NCS) from November 4, 2011. (R. 15). The ALJ concluded that "such condition has independently imposed no significant and persistent (i.e., over any 12 consecutive months) functional limitations during the period at issue. However, the claimant's related symptoms have been fully considered herein in assessing her work-related abilities." (Id.). When considering Plaintiff's RFC, the ALJ does not discuss Plaintiff's carpal tunnel syndrome, associated limitations or lack thereof. (R. 16-21).

Plaintiff's treating physicians found specific limitations related to Plaintiff's carpel tunnel syndrome. On February 9, 2011, Dr. Shaman opined that Plaintiff could only grasp, turn and twist objects with her hands five percent of the time and do fine manipulations only five percent of the time. (R. 462). On July 27, 2012, Dr. Khan opined that Plaintiff could only use her hands to grasp, turn, or twist objects ten percent of the time with her right hand and fifteen percent of the time with her left hand. (R. 706). She could only do fine manipulations twenty-five percent of the time with her right and left hands. (Id.). When discussing the treating source opinions in his decision, the ALJ does not discuss their findings regarding Plaintiff's hand limitations.

On August 17, 2012, Plaintiff reported to Dr. Nutter, the consultative examiner, that she had joint pain and tenderness in her hands and right wrist. (R. 655, 659). During the physical examination, Dr. Nutter found pain and tenderness diffusely in the finger joints on both hands, but noted no redness or swelling. (R. 657). He found Heberden's nodes. (Id.). He found that Plaintiff was able to make a fist bilaterally, could write and pickup goings without difficult, had normal range of motion of the finger joints and could squeeze his finger with a "good firm grip." (R. 657-58). However, Dr. Nutter noted Plaintiff's grip strength measured 0, 0 and 0 kg force on the right

and 4, 2 and 2 kg force on the left. (R. 658). He further found "grip strength is diminished when using the odynometer for the patient's age." (Id.). Despite these findings, Dr. Nutter concluded "I would rate grip strength as being intact at 5/5 bilaterally" with no further explanation. (Id.). When discussing Dr. Nutter's examination, the ALJ does not discuss these findings regarding Plaintiff's hand limitations. Moreover, in his medical source statement from August 30, 2012, Dr. Nutter further found Plaintiff could continuously do handling, fingering, feeling and pushing/pulling. (R. 662). However, the ALJ does not discuss this finding nor assign weight to Dr. Nutter's August 30, 2012 medical source statement.

Plaintiff also alleged various symptoms and limitations associated with her carpal tunnel syndrome. Plaintiff testified that she had difficulty doing things with her hands (R. 82), that her hands are "quite frequently numb and swollen," that at times she struggles "to get my digits to come to my thumbs" (R. 88), she often drops things, such as a coffee cup (R. 89), she cannot use a computer "for any length of time" because her hands go numb and she has problems typing after about five minutes (Id.).

The only medical evidence the ALJ discuss regarding Plaintiff's carpal tunnel syndrome was the EMG and sensory NCS from November 4, 2011. (R. 15). The ALJ failed to discuss the treating source and consultative examiner's opinions regarding limitations associated with Plaintiff's hands and/or wrists. The ALJ further failed to discuss Plaintiff's allegations regarding the severity and intensity of her symptoms associated with carpel tunnel syndrome. The ALJ's RFC does not include any limitations related to Plaintiff's ability to do handling, fingering or fine hand manipulation. (R. 16). As such, the undersigned is unable to determine whether such limitations were considered and then discredited, or whether the ALJ failed to consider such limitations. Accordingly, the ALJ's decision is again not supported by substantial evidence.

### c. Whether the ALJ Properly Evaluated Treating Source Opinions

Plaintiff argues that the ALJ failed to properly evaluate Dr. Shaman's opinion and failed to state "good reasons" in rejecting Dr. Shaman's opinion. (Pl.'s Br. at 14). Defendant argues that the ALJ assigned Dr. Shaman's opinion little weight and explained that the opinion was inconsistent with the evidence and appeared to be based on Plaintiff's subjective complaints. (Def.'s Br. at 9).

As a general rule, the opinion of a treating physician will be given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2); see also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983). When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. § 404.1527(d), 416.927(d); see also Heckler, 734 F.2d at 1015. When an ALJ does not give a treating source opinion controlling weight and denies benefits, the decision must contain "specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2; see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Moreover, the Social Security Rules provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 1527(d)(2); 20 C.F.R. § 416.927(d)(2). "It is well-settled that an ALJ may not reject medical evidence for no reason or for the wrong reason. Although he may, under the regulations, assign no or little weight to a medical opinion,

even one from a treating source, based on the factors set forth at 20 C.F .R. § 404.1527(d), he must explain his rationale, and it must be supported by the record." Kratzer v. Astrue, No. 5:07CV00047, 2008 WL 936753, at *11 (W.D. Va. Apr. 8, 2008) (citing King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980)).

The undersigned finds that the ALJ failed to provide adequate reasons supporting his decision to assign no significant weight to Dr. Shaman's February 9, 2011 opinion. While the ALJ listed various reasons for discrediting Dr. Shaman's opinion, the ALJ failed to provide specific reasons pursuant to SSR 96–2, failed to adequately explain his rationale and failed to support his findings with evidence from the record. For example, in discrediting Dr. Shaman's opinion, the ALJ claimed there was "no evidence" that Plaintiff needed to "lie down more than four of every eight hours." (R. 19). However, Dr. Shaman never made this specific finding. While Dr. Shaman found that Plaintiff could sit for less than two hours a day and stand/walk for less than two hours a day, his opinion included no specific recommendation that Plaintiff "lie down" for four hours a day. (R. 461). The ALJ also faulted Dr. Shaman for failing to explain how Plaintiff was able to work in the past despite still having neck surgery, IBS, low back pain and depression. (R. 19). Discrediting a treating source opinion for failing to anticipate a question from an ALJ is not a valid reason. Moreover, pursuant to SSR 96-5p, the ALJ was free to seek clarification from Dr. Shaman but did not. The ALJ also discredited Dr. Shaman because his fibromyalgia diagnosis was "questionable" (R. 20; however, as explained above, the ALJ refused to address medical evidence that indeed diagnosed Plaintiff with fibromyalgia.

The ALJ also claimed that Dr. Shaman impermissibly relied on Plaintiff's subjective complaints. (R. 19). Dr. Shaman treated Plaintiff on a regular basis since March 2010; he conducted physical examinations, ordered CT scans and x-rays and prescribed and monitored her

medications. There is no indication that Dr. Shaman's opinion was based exclusively on Plaintiff's subjective complaints rather than his longitudinal experience of observing and treating Plaintiff's conditions since 2010. Accordingly, the undersigned also finds this reason is insufficient to support the ALJ's decision to assign little weight to Dr. Shaman's opinion. See Williams v. Astrue, No. 2:12-CV-16, 2012 WL 3834884, at *21 (N.D.W. Va. Aug. 13, 2012) (finding that "a doctor who gives an opinion on a Social Security claimant's physical limitations must necessarily consider the claimant's subjective statements with other evidence.") (citing Bjornson v. Astrue, 671 F.3d 640, 646 (7th Cir. 2012); see also Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) ("A patient's report of complaints, or history, is an essential diagnostic tool."); Brand v. Sec'y, Dept. of Health, Educ., and Welfare, 623 F.2d 523, 526 (8th Cir. 1980) ("Any medical diagnosis must necessarily rely upon the patient's history and subjective complaints.").

The ALJ also explained he accorded less weight to the opinion because Dr. Shaman's findings were not adequately supported by the record and he cited inconsistent bases for her limitations. (R. 19-20). The ALJ discussed some of Plaintiff's allegations regarding her symptoms, such as: denying adnominal/pelvic pain in 2009 to 2010; reporting intermittent low back pain; maintaining some daily activities; and fasting in May 2010 to avoid going to the bathroom but reported having diarrhea 10 to 40 times a day in 2012. (R. 19). The ALJ listed these examples but then failed to explain how Plaintiff's reports of pain, daily activities or IBS symptoms were inconsistent with Dr. Shaman's opinion. Instead, the ALJ has impermissibly left the task to the Court to determine how the medical evidence, including Plaintiff's symptoms or activities of daily living, conflict with Dr. Shaman's opinion. See Cramer v. Astrue, No. 9:10-1872-SB-BM, 2011 WL 4055406 (D.S.C. Sept. 12, 2011); Smith v. Astrue, No. 2:11-CV-77, slip op. at 10-11 (N.D. W. Va. June 13, 2012). Rather than explain the weight assigned to Dr. Shaman's opinion, the ALJ

merely provided conclusory statements, listed unsupported reasons and failed to explain how evidence was inconsistent with Dr. Shaman's opinion. (R. 19-20). While there may be acceptable reasons in the record to discount Dr. Shaman's opinion, the ALJ failed to properly articulate such reasons in his decision. See Kratzer v. Astrue, No. 5:07CV00047, 2008 WL 936753, at *11 (W.D. Va. Apr. 8, 2008) (citing King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980)).

In addition, the undersigned finds that the ALJ failed to properly consider and weigh opinions from Plaintiff's other treating sources and State Agency consultants pursuant to 20 C.F.R. § 416.927 and SSR 96-2p and 96-5p. For example, the ALJ assigned "significant weight" to the State Agency's psychological consultants because they "appear as more objective and therefore, reliable" but provided no further explanation. (R. 21). The ALJ assigned "great weight" to the "May, June and July 2010 assessment of the State Agency's various medical consultants" in finding Plaintiff did not meet any listings but provided no rationale or explanation. (R. 15). "When there is a conflict in the medical opinion evidence, an ALJ is required to fully explain the weight given to each of the sources and the reasons for according such weight." See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Here, treating source physicians and State Agency physicians presented inconsistent opinions regarding Plaintiff's limitations. Contrary to the Agency regulations, the ALJ failed to articulate sufficient reasons for the weight assigned to the State Agency physician opinions.

In addition, the ALJ failed to assign any weight to Dr. Nutter's and Dr. Khan's opinions. On August 30, 2012, Dr. Nutter completed a medical source statement listing his opinions as to Plaintiff's physical ability to do work-related activities. (R. 660-65). The ALJ did not assign any weight to Dr. Nutter's Medical Source Statement even though the ALJ greatly relied on his consultative examination findings. (R. 18). The ALJ also stated he "rejects the limitations ascribed

by Dr. Khan" in his Chronic Fatigue Syndrome Residual Functional Capacity Questionnaire, but failed to assign the opinion any specific weight. (R. 21). "[W]hen a physician offers specific restrictions or limitations…the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). Moreover, a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon, 725 F.2d at 235. Here, the ALJ failed to assign a specific weight to the physician's opinions and failed to provide reasons for accepting or rejecting such opinions. According, the ALJ's decision is not supported by substantial evidence.

### d. Conclusion

As outlined above, the undersigned finds that the ALJ's decision is not supported by substantial evidence. On remand, the undersigned recommends that the Commissioner review and follow the directives of the Appeals Council's June 1, 2012 Remand Order. Specifically, the Commissioner should give further consideration to all evidence relevant to Plaintiff's fibromyalgia diagnosis, including the August 10, 2010 Mayo Clinic evaluation, with specific consideration to whether it is a medically determinable impairment and if so, whether such impairment is severe. The Commissioner should further consider Plaintiff's residual functional capacity in light of the assessed limitations, including limitations associated with Plaintiff's fibromyalgia, carpal tunnel syndrome and IBS. On remand, the ALJ should further consider and weigh all medical opinions contained in the record pursuant to 20 C.F.R. § 416.927 and SSRs 96-2p and 96-5p. Moreover, because the undersigned recommends remanding the case for the reasons stated above, the Court did not address Plaintiff's argument that the ALJ failed to properly consider her subjective complaints and recommends that on remand the Commissioner reassess Plaintiff's credibility in light of the entire record.

# VII.  RECOMMENDATION

For the reasons stated herein, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence. Accordingly, I respectfully **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED**, Plaintiff's Motion for Summary Judgment (ECF No. 11) be **GRANTED** and the decision of the Commissioner be reversed and **REMANDED** for further action in accordance with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., Senior United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this June 5, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE